**ECEE, INC., et al., Petitioners,**

**v.**

**FEDERAL ENERGY REGULATORY COMMISSION, Respondent.**

**Nos. 78–3688, 79–3428, 79–3521, 79–3912, 79–3913, 79–3914, 80–1306, 80–1119, 80–1468 and 80–1606.**

United States Court of Appeals, Fifth Circuit.

May 20, 1981.

---

Neal Powers, Jr., Byron A. Thomas, Butler, Binion, Rice, Cook & Knapp, Houston, Tex., for Ecee, Inc. et al.

Charles E. Suffling, R. Gordon Gooch, Bruce F. Kiely, Charles M. Darling, IV, Washington, D. C., for Tenneco Oil Co., General American Oil Co. of Texas, Texasgulf, Inc., Pennzoil Co. et al.

Jere G. Hayes, Robert C. Murray, General American Oil Co. of Texas, Dallas, Tex., for General American Oil Co. of Texas.

Ted G. White, Texasgulf, Inc., Houston, Tex., for Texasgulf, Inc.

Jerry M. Gross, Chicago, Ill., for Amoco Production Co.

Richard G. Harris, Kerr-McGee Corp., Oklahoma City, Okl., for Kerr-McGee Corp.

Sherman S. Poland, Nancy J. Hubbard, Washington, D. C., Martin N. Erck, C. Roger Hoffman, Houston, Tex., for Exxon Corp.

William A. Sackman, Marathon Oil Co., Findlay, Ohio, for Marathon Oil Co.

John E. Seddelmeyer, New Orleans, La., for Monterey Pipeline Co.

L. Eugene Dickinson, Kentucky West Virginia Gas Co., Ashland, Ky., Ross, Marsh & Foster, Washington, D. C., for Kentucky West Virginia Gas Co.

John E. Holtzinger, Jr., Karol Lyn Newman, Washington, D. C., for Consolidated Gas Supply Corp.

Michael J. Manning, Patrick J. Keeley, Washington, D. C., for Columbia Gas Development Corp., Energy Ventures, Inc. & Coleve.

Fulbright & Jaworski, Washington, D. C., for Forest Oil Corp.

Edward H. Forgotson, Lisa Anderson, O'Neill, Forgotson & Roncali, Washington, D. C., for Texas Oil & Gas Corp.

Justin R. Wolf, Washington, D. C., for Chevron U.S.A., Inc.

James T. McManus, Harold L. Talisman, Washington, D. C., Lilyan G. Sibert, Houston, Tex., for Tennessee Gas Pipeline Co.

Byron A. Thomas, Houston, Tex., for Inexco Oil Co.

Jerome Mrowca, Joseph M. Wells, Paul E. Goldstein, Richard E. Terry, Chicago, Ill., for Natural Gas Pipeline Co.

Frederick Moring, Jennifer Waters Hitt, Washington, D. C., for Associated Gas Distributors.

Jeffrey G. Shrader, Hall, Estill, Hardwick, Gable, Collingsworth & Nelson, William T. Sperry, J. Clayton La Grone, Tulsa, Okl., for Williams Exploration Co.

Thomas H. Burton, Houston, Tex., for Continental Oil Co.

Peter H. Schiff, Gen. Counsel, Albany, N. Y., Wilner & Scheiner, Washington, D. C., for Public Service Commission of the State of New York.

William W. Brackett, Daniel F. Collins, Terry O. Vogel, Washington, D. C., for Michigan Wisconsin Pipeline Co.

Lawrence E. Glenn, Robert W. Fuller, Lauren Eaton, A. Paul Brandimarte, Jr., Jeffrey G. Shrader, Houston, Tex., for Gulf Oil Corp.

David G. Stevenson, Marilyn O. Adamson, Tulsa, Okl., for Amerada Hess Corp.

Charles E. Reny, Pat F. Timmons, Houston, Tex., for Superior Oil Co.

Richard F. Remmers, Oklahoma City, Okl., for Sohio Natural Resources Co.

Carmen Chidester Gonzalez, Robert S. Wheeler, Tulsa, Okl., for Cities Service Co.

Frank X. Kelly, Gallagher, Boland, Meiburger & Brosnan, Washington, D. C., for Northern Natural Gas Co.

Kim Martin Clark, Akin, Gump, Hauer & Feld, Washington, D. C., for Northwest Pipeline Corp.

Arnold D. Berkeley, Bruce J. Wendel, Richard I. Chaifetz, Washington, D. C., for Arizona Electric Power Cooperative.

Karen A. Berndt, Ralph J. Pearson, Jr., Robert P. Thibault, Paul J. Broyles, John A. Ramsey, Houston, Tex., for Texaco, Inc.

John L. Williford, Larry Pain, C. J. Roberts, Bartlesville, Okl., for Phillips Petroleum Co.

Robert D. Haworth, Charles J. McClees, Jr., Letitia Z. Taitte, Houston, Tex., Mobil Oil Corp. et al.

David M. Whitney, Houston, Tex., for Aminoil USA, Inc.

Carolyn S. Hazel, Thomas H. Burton, Herman E. Garner, Houston, Tex., for Conoco, Inc.

Thomas G. Johnson, Robert A. Hasty, Jr., Houston, Tex., for Shell Oil Co.

Roscoe C. Elmore, B. James McGraw, Houston, Tex., for Cabot Corp.

Victor E. Fitzmaurice, Los Angeles, Cal., for Union Oil Co. of California.

Baker & Botts, Charles E. Suffling, Charles M. Darling, IV, Washington, D. C., Michael B. Silva, Phyllis Rainey, Richard L. Wynne, Houston, Tex., for Tenneco Oil Co.

R. Gordon Gooch, Charles M. Darling, IV, Charles E. Suffling, Baker & Botts, Washington, D. C., Patricia A. Curran, Julie Langdon, Michael B. Silva, Phyllis G. Rainey, Houston, Tex., Jere G. Hayes, Dallas, Tex., Robert C. Murray, Paul Van Wagenen, Ted G. White, Houston, Tex., for Pennzoil Co. et al.

Arnold D. Berkeley, Bruce J. Wendel, Richard I. Chaifetz, Washington, D. C., for Arizona Electric Power Cooperative, Inc.

Jerome Nelson, Sol., Kenneth F. Plumb, Eli Farrah, Washington, D. C., J. Paul Douglas, Atty., Robert Nordhaus, Federal Energy Regulatory Commission, Washington, D. C., for Federal Energy Regulatory Commission.

Before HENDERSON, ANDERSON and SAM D. JOHNSON, Circuit Judges.

SAM D. JOHNSON, Circuit Judge:

This case involves review of certain Federal Energy Regulatory Commission (FERC) interim and final regulations implementing the Natural Gas Policy Act of 1978. NGPA, 15 U.S.C.A. §§ 3301–3432. Challenged are those regulations governing the well determination process and collection of sales revenues, and those addressing the applicability of certain NGPA pricing categories. This Court affirms the FERC orders on review.[1]

1. The challenges are to portions of the following: Interim Regulations Implementing the NGPA, Part 275, Subpart B (Nov. 29, 1978); Order No. 34, Final Part 275 Regulations (June 14, 1979); Order on Rehearing of Order No. 34 (Aug. 13, 1979); Order No. 36, Final Part 273 Regulations (June 19, 1979); Order Denying Application for Rehearing of Order No. 36 (Aug. 20, 1979); Order No. 41, Final Regulations for Subparts A, C, D, and E, of Part 274 Concerning Determinations by Jurisdictional Agencies and Amendment to § 275.202 (Aug. 1, 1979); Order Denying Rehearing and Clarifying Order No. 41 (Sept. 28, 1979); Order No. 44, Final Rule Amending Subpart H of Part 271 on Stripper Well Natural Gas and Amendments to § 274.205 of the Interim Regulations (Aug. 22, 1979); Order No. 44–A, Granting in Part and Denying in Part Rehearing of Order No. 44 (Nov. 9, 1979); Order No. 65, Final Part 274, Subpart B Regulations (Jan. 4, 1980); Order No. 65–A, Granting in Part and Denying in Part Rehearing of Order No. 65 (Feb. 29, 1980); Order No. 72, Final Rule Adopting Regulations Implementing Section 109 (March 18, 1980); Order No. 72–A, Denying Applications for Rehearing (May 19, 1980).

## I. WELL DETERMINATION PROCEDURES

### A. Background

Prior to December 1, 1978, FERC regulated only interstate sales of gas under the Natural Gas Act of 1938. NGA, 15 U.S.C.A. § 717–717w. Interstate producer rate regulation was effectuated through national ceiling price orders that established different price levels depending on the date the producing well was commenced. On November 9, 1978 the NGPA became law. Its pricing and certain other provisions extend to all interstate and intrastate sales of natural gas on or after December 1, 1978. NGPA § 101(b)(4)(A), (C), 15 U.S.C.A. § 3311(b)(4)(A), (C).

NGPA § 503, 15 U.S.C.A. § 3413, concerns the determination of which NGPA incentive price category, if any, applies to a particular well, or to certain gas produced from a well. A state or federal agency having regulatory jurisdiction over the production of gas (the "jurisdictional agency"), on the application of a producer, determines if a particular well or gas is eligible for incentive pricing under section 102, *id.* § 3312 (new natural gas and certain Outer Continental Shelf gas), section 103, *id.* § 3313 (new onshore production wells), section 107, *id.* § 3317 (high-cost natural gas), or section 108, *id.* § 3318 (stripper well gas). FERC reviews these determinations. It must reverse if it finds that the determination is not supported by substantial evidence and may remand if it is inconsistent with information in FERC's public records that was not before the jurisdictional agency when the determination was made. The determinations become final and binding once they are no longer subject to Commission or judicial review (unless based on an untrue or omitted statement of material fact). FERC has forty-five days to make a preliminary finding to reverse or remand the determination, and 120 days to make a final finding to reverse or remand.

The NGPA also directs FERC to prescribe rules under which sellers may collect, subject to refund, the maximum lawful price for which a well determination application has been filed with the appropriate jurisdictional agency. Once that agency issues its finding that the gas qualifies for a certain maximum lawful price, the seller may continue to collect, subject to refund, the price specified in that determination pending FERC review. These collections during the pendency of the determination process are known as "interim collections."

### B. FERC Regulation of the Well Determination Process

FERC's regulations implementing section 503 require that an applicant for a determination search relevant and reasonably available records and submit certain information to the jurisdictional agency. FERC also requires that the jurisdictional agency's notice of determination to the Commission include the material that the applicant is required to submit to the jurisdictional agency. The regulations further provide that the statutory forty-five day period, in which FERC must make its preliminary findings, will not commence until all information submitted to the jurisdictional agency is submitted to the Commission.

Petitioners, who are gas producers, seek reversal and remand on the grounds that (1) FERC lacks authority to prescribe evidence that must accompany the filing for a determination; (2) it lacks authority to toll the forty-five day period in which to make a preliminary finding; (3) the documentation to substantiate new reservoirs improperly forces producers to disclose confidential information; and (4) the records search requirements are unreasonably and unduly burdensome.

#### 1. FERC Regulation of Determination Evidence

Section 503(a)(2) provides that the jurisdictional agency's notice of the determination "shall include such substantiation and be in such a manner as the Commission may by rule, require." Section 503(c)(3) autho-

rizes FERC to prescribe the "form and content of filings" with a jurisdictional agency in connection with the well determinations. Section 503(c)(3) also provides that the determinations shall be made in accordance with the procedures generally applicable to the jurisdictional agency for the making of the well determinations or comparable determinations under the provisions of the jurisdictional agency's applicable law.

■ Contrary to petitioners' assertion, this last provision does not give jurisdictional agencies authority to decide what evidence must be submitted in support of an application for determination. It merely provides that new and separate *procedures* for handling well determination applications would not be imposed on jurisdictional agencies; an agency's existing procedures are not disturbed. This says nothing about the *evidence* that an application must contain.

■ Petitioners argue that section 503(c)(3) empowers FERC to prescribe only minimal formal requirements for filings in the interest of uniformity. The grant of authority to FERC to prescribe not only the *form*, but also the *content*, of filings is, however, sufficient authority for FERC to specify the evidence that must be submitted to jurisdictional agencies.

■ Similarly, the grant of authority to establish substantiation requirements for determination notices expressly vests in FERC broad discretion to prescribe what the record on review must contain. Petitioners, however, argue that, since FERC can reverse only if there is no substantial evidence to support the determination, the substantiation requirement should be limited to evidence that supports the determination, rather than all factors, favorable and unfavorable, that went into the determination.

Apparently, petitioners fear that FERC will "second guess" the jurisdictional agency by independently weighing the evidence,

and seek to foreclose that possibility by limiting the evidence on review. Petitioners would have the jurisdictional agency determine which evidence supports the determination, and then allow FERC to agree or not that the supporting evidence is more than a scintilla. The evidence on review and the standard for reviewing the record are two entirely different matters, however.

■ The substantiation requirement goes only to the record to be reviewed under the substantial evidence standard. Section 503(b)(1)(A), on the other hand, provides the standard: FERC shall reverse if the determination is not supported by "substantial evidence *in the record upon which such determination was made*" (emphasis added). The NGPA Conference Committee Report explained that it provided the "traditional definition" of substantial evidence so that FERC would not "second guess" the agency by independently weighing *the evidence*. H.R.Rep.No. 1752, 95th Cong., 2d Sess. 118, U.S. Code Cong. & Admin. News 1978, 7659 (1978). The traditional standard is substantial evidence "on the record as a whole"— including record evidence that "fairly detracts" from the substantial weight of the supporting evidence. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–88, 71 S.Ct. 456, 463, 95 L.Ed. 456 (1951). The substantial evidence standard thus does not limit the scope of substantiation; FERC can require as substantiation the entire determination record. If in viewing that record FERC exceeds its authority on review and "second guesses" the jurisdictional agency, a valid ground exists for judicial relief. This Court holds that FERC has adequate authority to require that the application to the jurisdictional agency contain certain evidence, and to require that the notice of determination be accompanied by that same evidence, so that FERC can carry out the appellate functions the NGPA vests in it over jurisdictional agency determinations.[2]

---

2. Petitioners make much of the Conference Committee Report's statement, H.R.Rep.No. 1752, at 117, that jurisdictional agency determinations include subsidiary determinations required to ascertain for which category the natural gas production qualifies. This does not

## 2. Required Records Search

■ Although FERC has the authority to prescribe the evidence for applications and notices of determination, it may not exercise that authority in an arbitrary, capricious, or unreasonable manner. Petitioners claim that FERC has required the filing of duplicative, burdensome, and irrelevant evidence.

FERC regulations require the applicant to state under oath that "he has made or caused to be made a diligent search of all records (including but not limited to, production, severance tax and royalty payment records) which are reasonably available and contain information relevant to the determination of eligibility." Petitioners contend that this obligates them to search all records that might contain some pertinent information, and if a producer misses a single material fact, the oath is violated. The scope of the required search, however, is expressly limited to records that are both relevant and reasonably available. The information that the applicant must submit is limited to that necessary for the jurisdictional agency to make a determination of eligibility under the stringent factual criteria in sections 102, 103, 107, and 108.[3]

As corollaries of the reasonable availability and relevance limitations, FERC provided more specific delineations of the scope of the required records search. An applicant need not search a jurisdictional agency's records that contain only copies of the applicant's own records, as long as the applicant has no reason to believe that the agency's records contain relevant information in addition to these copies. Additional records need be searched only if those searched first do not provide the necessary information. Therefore, the applicant need not search records, simply because they might contain pertinent information, if he has already located in his own files all information necessary for the making of a determination. An applicant may also engage professional services to compile necessary data when his files lack the needed information and he wishes to avoid traveling to inspect the jurisdictional agency's records. Furthermore, applicants may refer to any application previously filed with the same jurisdictional agency, and upon which a determination has been made, that contains the same information required to be submitted in the current application. This eliminates the burden of refiling information that the jurisdictional agency and FERC already have. Finally, if jurisdictional agencies find the record search requirements too burdensome, they may request that FERC establish alternative filing and notice requirements.

■ The search requirement is an exercise of FERC's authority under NGPA § 501(a) to issue rules and orders necessary or appropriate to carry out its functions under the NGPA. This Court holds that FERC has reasonably carried out its well determination appellate review functions by assuring jurisdictional agencies can make reliable determinations and by assuring

---

undermine FERC's authority to require certain evidence in the record. The subsidiary determinations that the Report refers to are the specific subsidiary fact findings that go to the ultimate conclusion about the pricing category for which the gas qualifies.

Petitioners also make much of the Report's language at the same page that Congress did not intend to impose unnecessary paper work on state agencies. This statement, however, comes from the portion of the discussion concerning "negative determinations"—an agency's determination that the gas does not qualify for the category claimed by the applicant. The Report states that negative determinations need be sent only upon the request of the aggrieved party so as to minimize the necessary paperwork imposed on the states.

3. Eligibility turns on factual distinctions. Most are physical in nature: distance between wells; depth of completion locations; the date on which surface drilling began or on which a reservoir was penetrated or discovered; average daily production; and special geological characteristics (geopressured brine, coal seams, and Devonian shale). Many are legal: compliance with federal or state well-spacing requirements, and inclusion within a federal or state proration unit. A few distinctions are economic: production in paying or commercial quantities, and production that involves extraordinary risks or costs.

FERC ability to properly review those determinations.[4]

### 3. Tolling the Review Period

■ Petitioners argue that FERC lacks authority to toll the beginning of the section 503(b)(1)(B) & (2)(B) forty-five day preliminary review periods until the determination notice is accompanied by all the information FERC regulations require to be submitted. Although the Commission lacks express authority to toll the forty-five day period by issuance of an "incomplete notice," sufficient statutory authority nevertheless exists.

FERC must make a preliminary finding—that the determination is either unsupported by substantial record evidence, or is inconsistent with information in FERC's public records that was not part of the record below—within forty-five days from the date on which FERC receives the jurisdictional agency's notice of its determination. As stated in the Conference Committee Report, a preliminary reversal of the determination "must be made by the Commission within forty-five days of receipt of notification, *accompanied by the record*," of the agency decision. H.R.Rep.No. 1752, at 117, U.S. Code Cong. & Admin. News 1978, 9034 (emphasis added). FERC simply provided that deficient notices will not become effective until corrected.

The tolling provision is a reasonable exercise of FERC's section 501(a) authority to prescribe necessary or appropriate rules to implement section 503(a)(2)—specification of the substantiation that shall accompany the determination notice. Indeed, the provision that a materially deficient notice will instead be held in abeyance until corrected is a less drastic remedy than rejection of the deficient filings: the jurisdictional agency has an opportunity to correct the notices, and the producer's interim collection rights are protected because reversal immediately terminates, and remand terminates after six months, the right to make interim collections. It is only if the deficiency is not corrected that reversal or remand would become appropriate.

### 4. Disclosure of Confidential Information

■ Petitioners contend that some of the information that producers must submit to support the determination application is confidential geological information relating to the existence of new reservoirs.[5] The requirement that producers submit confidential information, however, is entirely valid. *See Superior Oil Co. v. FERC*, 563

---

**4.** Petitioners also argue that the required records search unreasonably delays the time in which an application can be filed. Interim collections cannot begin until the producer files the determination application; the application must be accompanied by the supporting evidence and the oath. Petitioners have not shown but merely assert that the records search requirement causes so substantial a delay in filing—and thus in the start of interim collection—that this exercise of FERC discretion is unreasonable. For gas already priced under §§ 104, 105, or 106, the delay, if any, is only in collection of the higher §§ 102, 103, 107, or 108 prices, that is, the price increase that a finding of eligibility bestows. For newly discovered gas, beginning the interim collection period on the date the application is filed provides an incentive for timely filing of the application and diligence in compiling the necessary information. Hardship exceptions may always be sought under NGPA § 502(c), 15 U.S.C.A. § 3412(c), in appropriate cases. If experience shows the delay substantial enough to warrant wholesale relief, FERC can always be petitioned to revise its rules. One possibility might be to provide a rule whereby the application can be preliminarily filed within some specified time period prior to the filing of the supporting evidence.

**5.** FERC claims that this objection is not properly before the Court because it was not raised in the applications for rehearing of Order No. 65. NGPA § 506(a)(4), 15 U.S.C.A. § 3416(a)(4), provides that "[n]o objection to such order of the Commission shall be considered by the court if such objection was not urged before the Commission in the application for rehearing unless there was reasonable ground for the failure to do so." In addition to the express statutory exception, other exceptions may apply. *See, e. g., Martinez v. Mathews*, 544 F.2d 1233, 1237 (5th Cir. 1976). Since this Court finds that the requirement to submit confidential data is valid, we need not decide whether such other exceptions exist, whether they would be met in this case if they did, or whether the express exception is met.

F.2d 191, 203–05 (5th Cir. 1977) (that information is within one of the exemptions or exclusions of the Freedom of Information Act does not alone prohibit its disclosure to the public). There is no doubt that the information is relevant to whether a well qualifies under statutory criteria for pricing under a particular category. More importantly, FERC established procedures to protect the confidentiality of the submitted information. FERC confers confidential treatment to information submitted to a jurisdictional agency, and gives the applicant five days telegraphic notice of any requests for the release of that information. *See also* 5 U.S.C.A. § 552(a)(6), (b)(4) & (9).[6]

### C. *FERC Review of Jurisdictional Agency Determinations*

The second main thrust of petitioners' objection is to FERC review of well determinations. The regulations permit "any person" to file a protest to a jurisdictional agency determination on the grounds that it is not supported by substantial evidence or is inconsistent with information in FERC files. To avoid the danger that all relevant views and information would not be presented, the Commission decided against limiting participation in its initial review process to those who participated in the jurisdictional agency proceedings. In addition, FERC provided that it would reopen determinations otherwise final and binding if later FERC concludes the determination was based on a material misstatement or omission.

Petitioners seek reversal and remand on the grounds that FERC (1) lacks authority to grant standing to "any person" to protest and participate in the section 503(b) proceedings; (2) lacks authority to permit protests and remands on the basis of evidence submitted by protestors; (3) denied petitioners the right to respond to FERC Staff and protestors; and (4) lacks authority to vacate rather than reverse or remand reopened determinations.

### 1. *Standing to Protest*

Petitioners claim that FERC lacks statutory authority to permit any person to protest the agency determination. Petitioners would impose on protestors the requirement that they have a legally cognizable interest equivalent to the constitutional standing requirement for seeking judicial review of administrative action that is embodied in 5 U.S.C.A. § 702—the adversely affected or aggrieved person standard.[7]

 Administrative adjudications, however, are not an article III proceeding to which either the "case or controversy" or prudential standing requirements apply; within their legislative mandates, agencies are free to hear actions brought by parties who might be without standing if the same issues happened to be before a federal court. *Gardner v. FCC*, 530 F.2d 1086, 1090–91 (D.C. Cir. 1976). *Accord, Koniag, Inc., Village of Uyak v. Andrus*, 580 F.2d 601, 611–17 (D.C. Cir.) (Bazelon, J., concurring), *cert. denied*, 439 U.S. 1052, 99 S.Ct. 733, 58 L.Ed.2d 712 (1978). An agency's

**6.** Petitioners' objection is to the requirement to file the confidential information. They do not expressly challenge the efficacy of FERC's confidentiality protections. Implicitly, however, any challenge to a requirement to disclose confidential information is a challenge to the effectiveness of any protections. Since the confidentiality protections were not questioned in the applications for rehearing, nor expressly and specifically pressed in this appeal, this Court declines to pass on this unstated issue at this time. The proper route to be taken if the protections prove inadequate is to request a rulemaking to make the protections complete.

**7.** Petitioners rely on a statement by Senator Jackson to support their assertion that only

adversely affected or aggrieved persons may seek review of the jurisdictional agency's determination. 124 Cong.Rec. S16264 (daily ed. Sept. 27, 1978) (remarks of Sen. Jackson). This statement, however, was in response to a question by Senator Danforth about what right a producer would have to FERC review if the jurisdictional agency denied his well determination application. Senator Danforth's concern was to ensure that, since FERC had no obligation to review each determination, there was some means for producer appeals in cases of denial. Senator Jackson's statement therefore cannot be taken as establishing the test for standing to protest by nonproducers in an entirely different context.

responsibility for implementation of statutory purposes justifies a wider discretion, in determining what actions to entertain, than is allowed to the courts by either the Constitution or the common law. *Gardner,* 530 F.2d at 1090.

Administrative standing analysis must always begin with the language of the statute and regulations that provide for an administrative hearing. *Koniag,* 580 F.2d at 614. Section 503 of the NGPA provides no guidance on the proper standard for protestor standing since it does not address protests. Indeed, the protest procedure is solely a creation of FERC discretion under its NGPA § 501(a) "necessary or appropriate" authority to implement section 503. Nor does NGPA § 502, which keys in the Administrative Procedure Act (APA), shed any light. Section 502(a) merely provides that the APA rulemaking procedures shall apply to any rule or order issued under the NGPA that has the applicability and effect of a rule as defined in 5 U.S.C.A. § 551(4). It provides no directive as to the applicability of the APA provisions concerning adjudications. The APA does have an automatic key-in provision when an agency is directed by its organic statute to provide an adjudicative hearing on the record, but that concerns adjudications when the agency is exercising a function equivalent to that of a trial court rather than an appellate court.

■ However, the APA does provide that an *interested person* may appear before an agency for the presentation, adjustment, or determination of an issue, request, or controversy in a proceeding, whether interlocutory, summary, or otherwise, or in connection with an agency function. 5 U.S.C.A. § 555(b). The interested person standard is thus the proper test for standing in this case.

■ The Commission's concern is that, since a preliminary finding to reverse or remand must be made within forty-five days, it would not have time to resolve close questions concerning standing to protest.

FERC stated in its brief that if and when the Commission issues a preliminary finding, any producer-applicant may in its written comments in opposition to the preliminary finding, include the grounds that the protestor lacks standing, FERC will thus determine the standing issue at the same time it decides whether the producer-applicant has shown the preliminary finding to be in error. This simply concerns the timing of the standing analysis, and not the standing requirement to be applied.

This Court holds that it is reasonable not to require that the protestor show standing when the protest is made or before the preliminary finding is issued. In light of the forty-five days in which the preliminary finding must be made, FERC can allocate, under its section 501(a) necessary or appropriate implementation power, the scarce resource of time to more important, central questions, leaving other issues like standing to consideration under less pressing circumstances. In light of 5 U.S.C.A. § 555(b), however, FERC must determine that the protestor does have interested person standing before it can adhere to a preliminary finding based on a protest. If the protestor lacks that standing, absent independent grounds to adhere, the Commission must reverse the preliminary finding and uphold the jurisdictional agency's determination. Although Congress can provide that no standing is required in the context of administrative proceedings, *Koniag,* 580 F.2d at 612, the APA does not so provide.

### 2. *Protester Evidence*

■ Petitioners also challenge the regulations permitting protestors to submit evidence not submitted to the jurisdictional agency. Because FERC could not guarantee that all persons with a cognizable interest in a well determination would be permitted to participate in a jurisdictional agency's proceedings, the regulation provides the procedure for consideration of all relevant evidence.[8] Petitioners contend

---

**8.** Producers are also protected by 18 U.S.C.A. § 1001, which applies criminal penalties if prot-

estors submit information with material mis-

that the evidence should have been submitted to the state agency, where the initial decision was made, and that otherwise FERC is converting itself from an appellate body to one conducting a trial de novo.

■■■ Petitioners would inhibit FERC flexibility by imposing on it a restrictive model of appellate court functions and limitations. Administrative agencies are not bound by such narrow conceptions, however, and this Court has traditionally construed the Commission's powers expansively so that it may flexibly deal with complex problems. *See Tenneco Oil Co. v. FPC*, 442 F.2d 489, 497 (5th Cir. 1971). *See also Dixon v. Love*, 431 U.S. 105, 115, 97 S.Ct. 1723, 1729, 52 L.Ed.2d 172 (1977) (procedural due process in administrative setting does not always require application of the judicial model). Moreover, petitioners' view of appellate functions is inaccurate with respect even to federal courts. NGPA § 506(a)(4) provides for judicial review of FERC orders. If any party applies to the court for leave to adduce additional evidence, and shows to the court's satisfaction that the evidence is material and that there were reasonable grounds for failure to adduce it in the Commission's proceedings, the court may order that it be taken before FERC and adduced upon the hearing in such manner and upon such terms and conditions as the court deems proper. FERC may then modify its fact findings in light of the additional evidence, and file the new or modified findings with the court for completion of the litigation. This Circuit's Local Rule 11.3 expressly permits intervention in proceedings for review of FERC orders. Section 506(a)(4)'s "any party" can include such an intervenor on appeal. *See* 7A C. Wright & A. Miller, Federal Practice & Procedure § 1920, at 611 (1972) (interve-

nor is treated as if an original party). In sum, the federal court can remand the case back to FERC for further findings of fact when intervenors present it with additional evidence on appeal.

■■■ Similarly, when FERC takes evidence from protestors, and if that evidence is inconsistent with the determination, FERC may remand the determination to the jurisdictional agency for further findings of fact. FERC's regulations thus do not create a procedure alien to American traditions of appellate review.[9]

Petitioners re-urge their argument in a more specific attack. Section 503(b)(2) authorizes the Commission to consider information not part of the record on which the jurisdictional agency made its determination if that information is in FERC's public records. Petitioners contend that this only provides authority to use information already part of the Commission's records, not additional information filed by protestors. The Conference Committee Report states only that the Commission "may utilize information available to it in its own files, books, and records for assistance in conducting its review." H.R.Rep. 95–1752, at 118, U.S. Code Cong. & Admin. News 1978, 9035. The Report and the statute are thus silent on whether FERC may make last minute additions to its public files before using that information in its review of jurisdictional agency determinations. In the face of such silence, FERC's construction of the statute as permitting last minute additions to its files is entitled to great deference unless clearly wrong. *See Ecee, Inc. v. FERC*, 611 F.2d 554, 563 (5th Cir. 1980). This Court cannot say that FERC's interpretation, which furthers consideration of all relevant evidence, is clearly wrong.

statements or omissions. This statute applies even though the statements are unsworn.

**9.** If the evidence in FERC's files, including that from protestors, is inconsistent with the determination, FERC may remand in its discretion. NGPA § 503(b)(2). Though the inconsistent information so detracts from the weight of the supporting evidence that it is not supported by substantial evidence on the basis of both the

record below and the additional information, reversal is improper as long as the determination is supported by substantial evidence in the record alone. *See id.* § 503(b)(1). In such a case, however, since the additional information is inconsistent with the determination, the avenue of remand is open, and it would probably be an abuse of discretion not to remand such a case.

### 3. *Opportunity to Respond to Protests*

Petitioners argue that they have been denied fifth amendment procedural due process because it is only after a preliminary finding to reverse or remand is issued that the applicant may respond to the opposing views of the FERC Staff or the protestor; petitioners would prefer an opportunity to respond prior to the issuance of the preliminary finding. FERC's timing of the opportunity to respond was based on the short time within which the Commission must make the preliminary finding. In effect, the producers must respond to the Commission's position, rather than simply the Staff's or the protestor's position, before the final finding is issued. A procedural disadvantage clearly exists. The question is whether that procedural disadvantage denies due process.

■■■ The test for determining what process is due is a balancing approach. *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). This permits varied types of hearings, from informal to more formal evidentiary hearings, *International Harvester Co. v. Ruckelshaus*, 478 F.2d 615, 631 (D.C.Cir.1973), and different timing for when any hearing must be held, ranging from either before or after the agency action, *Memphis Light, Gas & Water Division v. Craft*, 436 U.S. 1, 16–19, 98 S.Ct. 1554, 1564, 56 L.Ed.2d 30 (1978). The form and timing of a hearing depends on (1) the private interest affected; (2) the risk of an erroneous deprivation of that interest through the procedures used, if any, and the probable value, if any, of additional or substitute procedural safeguards; and (3) the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail. *Mathews*, 424 U.S. at 335, 96 S.Ct. at 903. In short, there must be an opportunity to be heard at a meaningful time and in a meaningful manner. *Id.* at 333, 96 S.Ct. at 901.

■■■ Since due process is flexible, this Court must look to the circumstances and statutory context in which the procedural disadvantage occurs. On balance, an opportunity to respond only after the preliminary filing is made does not deprive producers of due process. Not only does compliance with the forty-five day period give substantial weight to the governmental interest factor, the private interest is adequately protected by the informal conference and written comment provision. Any possible error in FERC reliance on protest information for its preliminary finding can be brought to FERC's attention before that finding is finalized. *See Memphis*, 436 U.S. at 16 n.17, 98 S.Ct. at 1564 n.17; *see also Withrow v. Larkin*, 421 U.S. 35, 95 S.Ct. 1456, 43 L.Ed.2d 712 (1975).

### 4. *Determination Finality Limitations*

Petitioners contend that FERC has exceeded its section 503(d) authority, which provides that a jurisdictional agency determination no longer subject to FERC or judicial review is binding unless based on an untrue or omitted statement of material fact. Under the regulations FERC may vacate a jurisdictional agency determination on the basis of newly discovered untrue statements or material omissions. Petitioners insist that the Commission should instead remand the determination to the fact-finding tribunal and should not act as a factfinder by making a redetermination.

■■■ The vacating of the original determination simply prevents the determination from having any binding effect, and thus terminates the right to collect the previously determined maximum lawful price. This is a reasonable exercise of section 501(a) authority to implement section 504(a)(1), which provides that no person may sell natural gas at a price in excess of the applicable NGPA maximum lawful price. The extent of FERC's factfinding is to decide whether a material misstatement or omission occurred, and if so, whether FERC or the jurisdictional agency relied on the misstatement or omission; if FERC then vacates the determination, it may decide whether refund of any collections in excess of the otherwise applicable maximum law-

ful price is appropriate, and if so, the amount of that excess. Since an eligibility finding is a matter for the jurisdictional agency, the selection of an "otherwise applicable maximum lawful price" is limited to calculation of the amount of the refund, and is not binding for any other purpose. The seller remains free to apply again to the jurisdictional agency for a new determination. This can even be for the same category that the seller was collecting under previously. Therefore, FERC is not acting as a factfinder with respect to eligibility, but only with respect to current ineligibility in light of material misstatements or omissions.

## II. REFUND OBLIGATION

FERC's regulations provide that the NGPA prices are collected "subject to a general obligation promptly to refund any portion of such price which is in excess of the maximum lawful price, or collection of which is not authorized by this subchapter." This refund obligation is in addition to the more specific refund regulations for interim collections or vacated determinations. Petitioners argue that this refund requirement exceeds the civil and criminal penalties specified in NGPA § 504, is inconsistent with the finality of jurisdictional agency determinations, or is an unreasonable and arbitrary exercise of discretionary authority.

 The first step in the analysis is to determine whether the Commission has the basic authority to promulgate such a general refund obligation. Section 504(a)(1) prohibits collecting rates in excess of the applicable maximum lawful price. The provision of this administrative mechanism is thus an exercise of FERC's section 501(a) necessary or appropriate implementation and administration authority to assure compliance with the statutory proscription. Contrary to petitioners' assertion, the section 504 civil and criminal penalties are not an exclusive grant of FERC's authority to impose remedies and sanctions. See Mesa Petroleum Co. v. FPC, 441 F.2d 182,

186–87 (5th Cir. 1971) (FPC is not limited to express remedies provided for in the NGA, but instead has authority to order refunds by virtue of NGA § 16, the necessary or appropriate power to carry out the Act). See also Estate of French v. FERC, 603 F.2d 1158, 1163 (5th Cir. 1979) (NGA refund power must must be exercised in conformity with responsibility to protect consumers from excessive charges); Louisiana Land & Exploration Co. v. FERC, 574 F.2d 204, 209 (5th Cir. 1978), cert. denied, 439 U.S. 1127, 99 S.Ct. 1043, 59 L.Ed.2d 88 (1979) (power to effectuate purposes of NGA by ordering refunds is well established).

Petitioners' argument of finality rests on two provisions of the NGPA. Section 503(d)(1) provides that jurisdictional agency determinations no longer subject to FERC or judicial review are final and binding, except when based on an untrue or omitted statement of material fact. Section 504(b)(6)(D) provides a three year statute of limitations on the imposition of civil penalties prescribed in section 504(b)(6)(A). Petitioners claim that these reflect a policy of assuring the finality of rates, which the general refund obligation allegedly violates.

 The finality expressly provided is not that broad, however. The statute of limitations expressly applies only to the section 504(b)(6)(A) civil penalties. It is therefore inapplicable to other remedies such as refunds for overcharges. The finality provided for in section 503(d)(1) relates only to which pricing category a particular well or gas production qualifies, and not to finality of rate collection. Petitioners would convert section 503(d)(1) into a statute of limitations that insulates overcharges—and one whose limitation period both begins and ends with the finalization of the eligibility determination. The untenability of such a position is obvious. Adequate finality instead comes from the application of laches, since a refund order is an equitable remedy. See Estate of French, 603 F.2d at 1163 (passage of time one of equitable factors used to decide if refunds should be ex-

cused). This brings us to the next argument.[10]

■ Petitioners contend in the alternative that, while the refund may be an appropriate remedy in many situations, FERC has required producers to waive all legal and equitable defenses—to become in effect guarantors and trustees—for any mistake made by anyone that results in overcharges. Under the NGA the ordering of refunds for overcharges is subject to equitable considerations.[11] The regulation does not, however, preclude the grant of equitable relief to sellers when refunds are inappropriate; such relief is always available in appropriate cases by means of a section 502(c) adjustment.[12]

■ The regulations also provide that when more than one seller has an interest in a well, any seller may designate another seller to make the filings required by the NGPA. In such a case, FERC further provided that the person filing on behalf of himself and others assumes both the general and the interim collection refund obligation for himself and for all persons on whose behalf he has made the filing. Petitioners argue that this improperly penalizes the person making the filings for himself and others.

This Court finds this requirement a reasonable exercise of Commission discretion because FERC recognizes that the other parties also remain liable for the refund obligation, and that the filing party who must initially satisfy the refund obligation is entitled to recover from the others any amounts paid on their behalf.[13] Further-

10. Petitioners also contend that the general refund obligation unreasonably subjects revenues to unending uncertainty. This argument is again asking for a conclusive presumption that rate collections are not in excess of the applicable maximum lawful price. The general refund obligation imposes no more uncertainty than does the possibility that other civil and criminal enforcement remedies may be brought at some future date for overcharges.

11. *Estate of French*, 603 F.2d at 1163; *Louisiana Land & Exploration*, 574 F.2d at 208; *Gillring Oil Co. v. FERC*, 566 F.2d 1323, 1325–27 (5th Cir.), *cert. denied*, 439 U.S. 823, 99 S.Ct. 91, 58 L.Ed.2d 115 (1978); *Placid Oil Co. v. FPC*, 483 F.2d 880, 905 (5th Cir.), *aff'd sub nom. Mobil Oil Corp. v. FPC*, 417 U.S. 283, 94 S.Ct. 2328, 41 L.Ed.2d 72 (1973).

12. This provides that FERC shall by rule provide for the making of such adjustments, consistent with the other purposes of the statute, as may be necessary to prevent special hardship, inequity, or an unfair distribution of burdens. This adjustment power is of course a matter for FERC's considered discretion, and review of its balancing of competing equitable considerations is limited to whether there is a rational basis, and thus no abuse of discretion, for the agency's determination. *Estate of French*, 603 F.2d at 1163. Any reviewing court presented with the issue may also excuse refunds in appropriate circumstances. NGPA § 504(b)(4).

13. *See also Tenneco Oil Co. v. FPC*, 442 F.2d 489 (5th Cir. 1971). In *Tenneco*, this Court affirmed the Commission's order requiring a certificate holder to make refunds on behalf of both his predecessors in interest and his co-

owners. There the Court noted that the successor in interest could seek recoupment from the prior owner who actually received the excess payments and was therefore primarily liable if the contractual assignment permitted such recoupment. *Id.* at 494. Recoupment similarly was available from co-owners, unless they were so numerous that their individual refund liability was less than the cost of recoupment. *Id.* at 495. Finally, the Court in *Tenneco* noted that the imposition of a refund obligation on the certificate holder was reasonable in light of the enormous administrative difficulty for the FPC if it had to contact and collect from each individual owner or predecessor in interest. *Id.* at 496–97.

In *Tenneco* the rates were temporary, not final, and were collected subject to the express refund requirements of NGA § 4(e), 15 U.S.C.A. § 717c(e). This does not adequately serve to distinguish *Tenneco*. The temporary nature of the rates in *Tenneco* sheds no light on why a similar rule cannot be established with respect to final rates. The appropriateness of such a rule turns on other considerations entirely, as expressed above in *Tenneco* itself. That the rates in *Tenneco* were collected subject to an express NGA refund obligation is of no distinction either. The person filing here on behalf of others must satisfy not only the general but the specific interim collection refund obligation. The latter was promulgated pursuant to the express refund requirements of NGPA § 503(e). A requirement that the filing party initially satisfy the interim collection refund obligation is not stated in § 503(e), but it is certainly a reasonable exercise of § 501(a) implementation authority to provide such a rule when permitting one person to file on behalf of others.

more, this filing procedure is merely optional—an alternative to duplicative individual filings by all persons having an interest in the well. The parties may always individually file if the alternative arrangement is unsatisfactory.

## III. *STRIPPER WELL PRICING*

■ Section 108 prescribes the maximum lawful price for stripper well natural gas, which it defines as gas not produced in association with crude oil and that is produced during any month from a *well* if the *well* produced the nonassociated gas at not more than an average of 60 Mcf per production day. The Commission's final regulations implementing section 108 provide in pertinent part that "the total volume of natural gas produced from the well shall constitute its daily production regardless of whether the well is completed in more than one [production zone or] interval or the production is separately metered from separate intervals . . . ." This definition relies on the statute's separate definition of the terms "well" and "completion location" [14] and its use of "well" rather than "completion location" in section 108.

Petitioners contend that section 108 requires each completion location within a multi-completion well be treated as a separate well for purposes of determining stripper well status. FERC counters that Congress was well aware that a well can produce from more than one subsurface location, since it used the term "completion location" in sections 102, 103, and 107. Section 108's use of the term "well" rather than "completion location," in light of this knowledge, implies that all production from the well, and not just from the completion location, determines stripper well status.[15]

Petitioners point out that the use of completion location in NGPA §§ 102, 103, and 107 is limited to a description of the depth of the well. These provisions require that the well have a certain depth, or that the production be from a certain depth, to qualify for pricing under them. Petitioners contend it was necessary for Congress to specify completion location in those sections concerned with the depth of production, but not when the amount of production was the crucial determinant for pricing eligibility. That very argument, however, cuts against petitioners' position. When Congress was concerned with depth of production, completion location was a proper focus since it is a point of production from the well bore. When the concern is the amount of production, the focus is necessarily different, depending on the exact concern involved. Section 108's purpose is to provide a special price for wells with low production volumes because, absent an incentive price, the revenues therefrom may not cover the out-of-pocket operating costs of maintaining production. In short, the incentive is focused on marginal production from a well. Had Congress intended to provide an incentive

Although the general refund obligation was promulgated pursuant to NGPA § 501(a), it is similarly reasonable that, when providing for a single filing by several persons, FERC require the same rule. In short, it is the ability to file on behalf of others, and not the type of rates or type of refund obligation, that is relevant to whether satisfaction of the refund obligation can be imposed initially on the party filing on behalf of others.

14. NGPA § 2(7), 15 U.S.C.A. § 3301(7), defines "completion location" as any subsurface location from which natural gas is being or has been produced in commercial quantities. Section 2(2), *id.* § 3301(2), defines "well" as any well for the discovery or production of natural gas, crude oil, or both.

15. FERC points to the Conference Committee Report, which also discusses stripper well production from a well and not from a completion

location. H.R.Rep. 95–1752, at 88. Petitioners, on the other hand, claim that the Report shows that Congress considered the terms "reservoir" and "well" to be interchangeable when rate of production is involved, citing to page 89 of the Report where the Committee discusses the phrase "maximum efficient rate of flow."

The Conferees defined maximum efficient rate of flow as the maximum rate at which the well could produce without damage to the reservoir. When the well cannot produce at the reservoir's maximum efficient rate of flow, that term shall mean the maximum rate at which the well can produce. The only interchangeable feature to the Committee's use of "well" and "reservoir" derives from its explanation of maximum efficient rate of flow in the context of a well that produces from a single reservoir. This of course implies nothing about a well that produces from several reservoirs.

for marginal production from a reservoir, it would have expressly so stated, since it separately defined the term "reservoir."[16] Petitioners do not even argue for an interpretation that gives the incentive just to marginal reservoirs, but instead to every point of marginal production from the well bore, whether or not the completion locations are in the same or separate reservoirs.

Secondly, petitioners argue that it is possible that production from different producing horizons penetrated by one well bore may qualify for different NGPA pricing categories, in which case separate eligibility determinations are made for each production horizon. The example they provide is production from one horizon that qualifies as new natural gas under section 102(c), and production from a second horizon penetrated by the same well bore that qualifies as gas produced from a "new onshore production well" under section 103(c). That a well may produce gas that qualifies under two different pricing provisions is a result of the limited use of completion location as the qualifying unit of production in sections 102 and 103. It does not require that this Court read completion location into section 108.

■ Petitioners further contend that FERC's definition of stripper well gas does not conform to state laws and practices, which treat separate completions as separate wells. It is the NGPA, and not state laws and practices, however, that determines what constitutes stripper well gas for purposes of section 108. This is a simple

matter of preemption. U.S.Const. art. VI, cl. 2. Congress plainly knew how to direct that state laws or practices be followed in the implementation of the NGPA. For example, in section 108 itself, Congress declared that the stripper well's average daily production must be at its maximum efficient rate of flow, determined in accordance with *recognized* conservation practices designed to maximize the ultimate recovery of gas. This is a clear directive to respect and rely on state agency determinations of what constitutes recognized conservation practices. H.R.Rep. No. 1752, at 88–89; 124 Cong.Rec. H13118 (daily ed. Oct. 14, 1978) (statement of Rep. Dingell). This was only sensible since the states have been regulating production practices for many years to prevent waste. Whether the qualifying unit of production is producing at its maximum is an entirely different question from whether the price incentive should be broadened by choosing a narrower qualifying unit of either reservoir or completion location. The absence of any language in the NGPA or the legislative history directing that state practices be followed with regard to defining the qualifying unit confirms that congressional choice of the term "well" remains controlling in the face of conflicting state definitions.[17]

## IV. NEW WELLS NOT OTHERWISE QUALIFYING FOR HIGHER MAXIMUM LAWFUL PRICES

■ Section 109 of the NGPA prescribes the maximum lawful ceiling price for gas

**16.** Section 2(6), 15 U.S.C.A. § 3301(6), defines "reservoir" as any producible natural accumulation of gas, oil, or both, confined (1) by impermeable rock or water barriers and characterized by a single natural pressure system, or (2) by lithologic or structural barriers that prevent pressure communication.

Under NGPA § 107(b) & (c)(5), the Commission may prescribe a price higher than the otherwise applicable maximum lawful price to the extent that the special price is necessary to provide reasonable incentives for gas produced under conditions of extraordinary risk or cost. Thus, FERC may evaluate, in light of economic conditions, whether the special § 108 incentive for marginal wells is inadequate, and by its § 107 power may prescribe an incentive rate for production from marginal reservoirs. FERC recently provided just such an incentive

for certain reworking operations on wells producing what would otherwise have been § 105 gas. 18 C.F.R. 271.704 (qualified production enhancement gas). Any further expansion of incentives for marginal production is a matter for FERC's reasoned discretion, as may be prompted by producer applications demonstrating that circumstances sufficiently warrant such a rulemaking.

**17.** Petitioners also argue that the FERC regulations are inconsistent with Department of Energy practices, which treat separate completions as separate stripper wells for oil production under the Energy Policy and Conservation Act, Pub.L. 94–163, 89 Stat. 871 (1975). However, it is the choice of Congress in defining stripper well production, and not the choice of the Department of Energy, that controls in this case.

not covered by any maximum lawful price under any other section, and includes four specific categories listed in section 109(a). At issue here is the first category—natural gas produced from any new well [18] not otherwise qualifying for a higher maximum lawful price.[19] A new well may not qualify for a higher price if it fails to meet the additional factual requirements of sections 102, 103, and 107.[20] The regulations implementing section 109 provide that sales of gas described in section 109(a)(1)–(4) are priced under section 109 only to the extent that they are not covered by any maximum lawful price under NGPA §§ 102 through 108.

Petitioners contend that section 109 applies to gas not covered by any maximum lawful price under any other section, *and* also covers gas produced from any new well not otherwise qualifying for a higher maximum lawful price. Under the petitioners' construction, gas covered by sections 104, 105, or 106 could also qualify for the higher section 109 price if the gas were produced from a new well.[21] FERC asserts that section 109 covers only natural gas not covered by any maximum lawful price under any other section. Under FERC's interpretation, gas from a new well covered by sections 104, 105, or 106 would be held to that applicable price and not section 109, and would escape from pricing under sections 104, 105, or 106 only if the gas qualifies for an incentive price under sections 102, 103, 107, or 108.

FERC's analysis that led it to its interpretation runs as follows: The categories described in clauses (2), (3), and (4) of section 109(a) are easily comprehended within the introductory language, "natural gas which is not covered under . . . any other section." Congress must have meant for the gas described in clause (1) to fall within section 109 only to the extent that it is not subject to sections 104, 105, or 106, or has not qualified for an incentive price under sections 102, 103, 107, or 108. Otherwise Congress would have defined section 109's scope simply with two general categories: gas not covered by any other section, and gas produced from any new well not otherwise qualifying for an incentive price under sections 102, 103, 107, or 108. Looking at the section as a whole, FERC viewed the petitioners' interpretation as leading to an anomalous result. Congress would have drafted four parallel clauses with the intent that one would substantively expand the scope of section 109 as set forth in the

**18.** A new well is one commenced or deepened at least 1,000 feet on or after February 19, 1977. NGPA § 2(3), 15 U.S.C.A. § 3301(3).

**19.** The other specific categories of gas failing to qualify for any other section are § 109(a)(2), which is gas dedicated to interstate commerce but cannot qualify for § 104 because there was no applicable FPC rate in effect for the gas on November 8, 1978, the day before the NGPA's enactment; § 109(a)(3), which is gas not dedicated to interstate commerce but cannot qualify for § 105 because there was no existing or successor intrastate contract for that gas on November 8, 1978; and § 109(a)(4), which is gas from Prudhoe Bay, Alaska.

**20.** For example, the well may not meet the distance test in § 102, the well spacing and proration unit requirements of § 103, or the depth test of § 107.

**21.** Section 104 applies to gas committed or dedicated to interstate commerce on November 8, 1978, and for which there was an NGA just and reasonable rate in effect. This section essentially freezes and carries forward the most recent FPC national ceiling rate opinion. The § 109 rate is the same as the highest FPC rate available under § 104. For all but the highest priced gas under § 104, there is a financial incentive to be priced under § 109 instead of § 104.

Section 105 applies to gas not committed or dedicated to interstate commerce on November 8, 1978, and for which an existing or successor contract was in effect. Section 105(b)(1) provides that for intrastate contracts with prices less than the § 102 rate, the § 105 maximum lawful price is the lower of the prices under the terms of the contract or the § 102 rate. For gas under contracts unable to escalate the contract price to the § 102 cap on contractual escalations, and whose price is less than the § 109 price, there is again an incentive to be priced under § 109 rather than § 105.

Section 106 applies to gas under a rollover contract that had been priced under §§ 104 or 105. It essentially carries forward the § 104 or § 105 pricing. The same incentive for gas with prices less than § 109 is carried forward with § 106.

introductory clause, while the other three would not expand its scope and thus would have no substantive effect whatsoever. FERC thus concluded that the introductory clause is a general limitation on the applicability of section 109, and that FERC must give equal though limited effect to the four succeeding clauses as simply illustrative of the scope of the introductory clause.[22]

The answer to this issue requires an interpretation of sections 109 and 101(b)(5). The latter provides that if any gas qualifies under more than one pricing section, the section that could result in the highest price shall be applicable.

Under the rule of section 101(b)(5), it might seem that gas qualifying for section 104, 105, or 106 pricing but produced from a new well should be able to receive the section 109(a)(1) price, if higher. This is the petitioners' position. Section 101(b)(5), however, applies only when gas can qualify for *more than one category*. If, as FERC suggests, the section 109(a) introductory clause limits the application of section 109(a)(1), then section 101(b)(5) would be inapplicable—the introductory clause limits section 109's applicability to gas *not covered by any other section*. Under this view section 109 could never apply to gas that is already qualified for pricing under some other section. The focus of analysis must therefore be brought back to section 109.

The key to the analysis is the relationship between the general introductory clause of section 109(a) and its subclause (1). Section 109 provides in pertinent part:

(a) Application.—The maximum lawful price computed under subsection (b) of

this section shall apply to any natural gas delivered during any month, in the case of any natural gas which is not covered by any maximum lawful price under any other section of this part, including—

(1) natural gas produced from any new well not otherwise qualifying for a higher maximum lawful price under this subchapter;

(2) . . .;

(3) . . .; and

(4) . . . .

That relationship hinges on the use of the word "including," the last word in the general description that precedes the four specific categories. No one disagrees that "including" means comprising, comprehending, or embracing. The dispute is over what "including" refers to. FERC contends that it modifies the general description of gas, and therefore evinces a congressional intent to enclose the specific categories within the general category. Petitioners, on the other hand, argue that it modifies not "natural gas," but "maximum lawful price." Under the latter view, the subcategories are given an independent stature equal to that of the general description, as if the statute read "and in addition" instead of "including." FERC's view of what "including" refers to, and not that of petitioners, is correct.

Sections 102(a), 103(a), 104(a), and 105(a) employ a particular structure to describe the application of the pricing section. This is a two-part structure: (1) a description of the type of gas covered, indicated by the clause beginning "in the case of"; and (2) an explanation of how its maximum lawful

**22.** FERC also pointed to § 503(e)(1)(B)(iii) as support for its construction of § 109. Section 503(e)(1), a transitional rule that has since expired, authorized interim collection of the § 109 price pending a jurisdictional agency eligibility determination. Section 503(e)(1)(B)(iii) required that interim collections from sales of gas from new wells were subject to refund if the jurisdictional agency determined that the applicable maximum lawful price was less than the § 109 price. FERC noted that there would be no possibility of refunds, and no need for § 503(e)(1)(B)(iii), if all gas from new wells automatically qualified for the § 109 price. Petitioners argue, however, that the state agency

might have ultimately determined that the well was not a new well. From this they argue that § 503(e)(1)(B)(iii) is not meaningless surplusage if their interpretation is adopted.

Section 503(e)(1) was broad enough to include both the failure of new wells to qualify for §§ 102, 103, and 107, as well as failure of the well to qualify as a new well. Unfortunately for petitioners, this does not further their construction of § 109(a)(1). Their reading of § 503(e)(1) saves it from being mere surplusage under their interpretation of § 109(a)(1), but their reading of § 503(e)(1) is also consistent with FERC's reading of § 109.

price shall be applied.[23] When Congress intended to describe separate, independent types of gas as subject to the same price category, it introduced those descriptions with the phrase "in the case of," and followed that phrase with indented, numbered clauses describing each type of gas covered. *See* NGPA § 102(a)(1) & (2). *See also* NGPA §§ 101(b)(9), 503(a)(1) (employing in different contexts similar two-part structure of description and explanation, with indented, numbered clauses for multiple objects of equal stature). Section 109(a) also employs the two-part structure of description and application. In stark contrast to section 102, section 109 places only the general description after the phrase "in the case of," and then follows the general clause with the indented, numbered clauses. The clear import of this difference in drafting is that the general clause is the description of the covered gas, and the indented, numbered clauses are simply examples included within the general description. If Congress had intended for the specific categories to stand on an equal footing with the general description, it would have drafted the general description as an indented, numbered clause so that the phrase "in the case of" would have introduced each separate clause, independently.

In direct conflict to this reading of the statute is the Conference Committee Report. In describing the application of section 109, the Report lists five indented and numbered categories of gas, the last listed category being any gas not covered by any other section. This structuring expressly places the general introductory clause on a par with the other categories, giving subclause (1) independent effect. Although the Conference Committee Report is useful

and persuasive evidence of congressional intent, it is not conclusive; when it is in direct contradiction to the most reasonable interpretation of the statutory language, the Report cannot serve to require a contrary result.[24] Had Congress used for section 109 the structure in section 102 or the Report's summary of section 109, or had it used "and in addition" instead of "including," the Report would have been persuasive support of petitioners' construction.

FERC additionally argues that if the section 109 price is applicable to every new well, a producer could drill a superfluous well into an already producing reservoir, abandon the "old" well priced under sections 104, 105, or 106, and claim the section 109 price for the new well. Consequently, there would be a diversion of exploration and development capital into projects that serve only to increase the price on flowing gas, rather than increasing the supply of gas. This result is contrary to the NGPA policy objective in section 103, which provides the intended incentives for further developing existing reservoirs without wasteful allocation of society's scarce and valuable energy exploration and development resources. Furthermore, FERC's position prevents circumvention of the section 104, 105, and 106 pricing provisions.

Finally, the very purpose of section 109 indicates the reasonableness of FERC's interpretation. Section 109 is a catchall category—gas that somehow falls between the cracks of the elaborate pricing scheme in sections 102 through 108 will receive some price. It is thus a pricing provision of last resort. Therefore, section 109(a)(1) applies only if no other provision can apply. FERC's rule is consistent with this congres-

**23.** Sections 106, 107, and 108 also employ a similar structure, but rather than separately *describe the maximum lawful price in a separate subsection, these combine the description* of the section's application and its maximum lawful price in one subsection.

**24.** *NLRB v. Plasterers' Local Union No. 79, Operative Plasterers' & Cement Masons' Internat'l Ass'n, AFL–CIO,* 404 U.S. 116, 129 n.24, 92 S.Ct. 360, 368 n.24, 30 L.Ed.2d 312 (1971) (contradictory legislative materials should not

be permitted to control the customary meaning of words); *United States v. Rone,* 598 F.2d 564, 569 (9th Cir. 1979) (proper function of legislative history is to solve, and not create, an ambiguity); *United States v. United States Steel Corp.,* 482 F.2d 439, 444 (7th Cir.), *cert. denied,* 414 U.S. 909, 94 S.Ct. 229, 38 L.Ed.2d 147 (1973) (the plainer the statutory language, the more convincing must be contrary legislative history).

sional purpose and must be sustained as reasonable.

## V. CONCLUSION

The NGPA's complexity is but one more example of why federal courts show great deference to administrative interpretations of an agency's own statutes and limit their inquiry to whether the agency's actions are authorized and rational. *See Udall v. Tallman*, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1963). On the other hand, Congress entrusted FERC with the task of responsibly interpreting the NGPA in a manner that furthers the purpose of that legislation. This Court is satisfied that FERC has lived up to its obligation. Therefore, the orders under review are

AFFIRMED.