716 F.2d 1
 230 U.S.App.D.C. 197
 INTERSTATE NATURAL GAS ASSOCIATION OF AMERICA, Petitioner,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent,
Mobil Oil Corporation, et al., General American Oil Company
of Texas, Phillips Petroleum Company, Pennzoil Company,
Mississippi River Transmission Corp., Shell Oil Company,
Exxon Corporation, Laclede Gas Company, Getty Oil Company,
Louisiana Land & Exploration Company, Associated Gas
Distributors, Northern Natural Gas Company, Texas Gas
Transmission Corporation, Texaco, Inc., Tenneco Oil Company,
Houston Oil and Minerals Corporation, Gulf Oil Corporation,
Placid Oil Company, Aminoil, USA, Inc., et al., Intervenors.
MICHIGAN WISCONSIN PIPELINE COMPANY, Petitioner,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent,
Mobil Oil Corporation, et al., Amoco Production Company,
General American Oil Company of Texas, Phillips Petroleum
Company, Pennzoil Company, Exxon Corporation, Shell Oil
Company, Tenneco Oil Company, Union Oil Company of
California, Louisiana Land & Exploration Company, Getty Oil
Company, Associated Gas Distributors, Laclede Gas Company,
Sun Oil Company, Arco Oil & Gas Company, Placid Oil Company,
Texaco, Inc., Gulf Oil Corporation, Intervenors.
TRANSCONTINENTAL GAS PIPE LINE CORPORATION, Petitioner,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent,
Mobil Oil Corporation, General American Oil Company of
Texas, Phillips Petroleum Company, Pennzoil Company, Shell
Oil Company, Associated Gas Distributors, Getty Oil Company,
Louisiana Land & Exploration Company, Texaco, Inc., Exxon
Corporation, Sun Oil Company, Tenneco Oil Company, Houston
Oil and Minerals Corporation, Gulf Oil Corporation, Placid
Oil Company, Intervenors.
NATURAL GAS PIPELINE COMPANY OF AMERICA, Petitioner,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent,
Mobil Oil Corporation, et al., General American Oil Company
of Texas, Phillips Petroleum Company, Pennzoil Company,
Shell Oil Company, Laclede Gas Company, Associated Gas
Distributors, Getty Oil Company, Louisiana Land &
Exploration Company, Texaco, Inc., Sun Oil Company, Chevron,
USA, Exxon Corporation, Tenneco Oil Company, Houston Oil and
Minerals Corporation, Gulf Oil Corporation, Placid Oil
Company, Intervenors.
LONE STAR GAS COMPANY, Petitioner,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent,
General American Oil Company of Texas, Phillips Petroleum
Company, Pennzoil Company, Shell Oil Company, Laclede Gas
Company, Louisiana Land & Exploration Company, Getty Oil
Company, Associated Gas Distributors, Valero Transmission
Company, Texaco, Inc., Exxon Corporation, Sun Oil Company,
Tenneco Oil Company, Houston Oil and Minerals Corporation,
Gulf Oil Corporation, Placid Oil Company, Panhandle Eastern
Pipe Line Co., et al., Intervenors.
LACLEDE GAS COMPANY, Petitioner,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent.
LONE STAR GAS COMPANY, Petitioner,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent,
Exxon Corporation, Conoco Inc., General American Oil Company
of Texas, Pennzoil Company, Tenneco Oil Company, Union Oil
Co. of California, Getty Oil Company, Aminoil USA, Inc.,
Gulf Oil Corporation, Texaco, Inc., Mobil Oil Corporation,
et al., Houston Oil and Minerals Corporation, Shell Oil
Company, Atlantic Richfield Company, Sun Exploration and
Production Co., Intervenors.
ASSOCIATED GAS DISTRIBUTORS, Petitioner,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent.
 Nos. 81-1690, 81-1680, 81-1691, 81-1692, 81-1696, 81-1802,
82-1004 and 82-1177.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Nov. 2, 1982.
Decided Aug. 9, 1983.
 
 Petition for Review of Orders of the Federal Energy Regulatory commission.
 John H. Cheatham, III, Washington, D.C., with whom Judith M. Johnson, Houston, Tex., was on the brief for petitioner, Interstate Natural Gas Ass'n of America.
 Douglas G. Robinson, Washington, D.C., with whom Erica A. Ward, Enid L. Veron, Washington, D.C., and Michael K. Chapman, Houston, Tex., were on the brief for petitioner, Lone Star Gas Co. Rodney O. Thorson, Washington, D.C., also entered an appearance for petitioner.
 William W. Brackett, Washington, D.C., with whom Daniel F. Collins and Terry O. Vogel, Washington, D.C., Michigan Wisconsin Pipe Line Co., Thomas F. Ryan, Jr., and Richard T. Boone, Washington, D.C., Transcontinental Gas Pipe Line Co., Paul E. Goldstein, Chicago, Ill., Harry L. Albrecht and Robert D. Rosenberg, Washington, D.C., Natural Gas Pipeline Co. of America, Cleon L. Burt, St. Louis, Mo., and John B. Rudolph, Washington, D.C., Mississippi River Transmission Corp., Dean W. Wallace, and John B. Will, Omaha, Neb., Northern Natural Gas Co., were on the brief for petitioners, Michigan Wisconsin Pipe Line Co., et al.
 Frederick Moring, Washington, D.C., was on the brief for petitioner, Associated Gas Distributors.
 J. David Mann, Jr., Washington, D.C., was on the brief for petitioner, Laclede Gas Co.
 Joel M. Cockrell, Atty., F.E.R.C., Washington, D.C., with whom Charles A. Moore, Gen. Counsel, Houston, Tex., Jerome M. Feit, Sol., F.E.R.C., and George H. Williams, Jr., Atty., F.E.R.C., Washington, D.C., were on the brief, for respondent.
 
 
 1
 Douglas W. Rasch, Houston, Tex., with whom Edmunds Travis, Jr., Houston, Tex., Exxon Corp., David M. Whitney, Houston, Tex., Aminoil USA, Inc., et al., Arthur Wright, Dallas, Tex., Atlantic Richfield Co., Justin R. Wolf and George Rothschild, Washington, D.C., Chevron USA, Inc., Tom Burton and Ernest T. Altgelt, Houston, Tex., Conoco, Inc., Charles M. Darling, IV, Washington, D.C., and Thomas J. Eastment, New York City, General American Oil Co. of Tex., Cloy D. Monzingo and Roger L. Brandt, Houston, Tex., Getty Oil Co., Lawrence E. Glenn and Thomas A. Loftus, III, Houston, Tex., Gulf Oil Corp., Edwin S. Nail, Houston, Tex., Houston Oil and Mineral Corp., Robert D. Haworth and Edgar K. Parks, Houston, Tex., Mobil Oil Corp., et al., Patricia A. Curran, Houston, Tex., Pennzoil Co., C.J. Roberts, Charles L. Pain and Jennifer A. Cates, Phillips Petroleum Co., Ronald D. Hurst, Dallas, Tex., Placid Oil Co., Thomas G. Johnson and Robert A. Hasty, Jr., Houston, Tex., Shell Oil Co., Harry W. Sullivan, Jr., and Becky McGee, Dallas, Tex., Sun Exploration and Production Co., Pat Timmons, Houston, Tex., The Superior Oil Co., Phyllis Rainey and Richard G. Harris, Houston, Tex., Tenneco Oil Co., Karen A. Berndt, Washington, D.C., Texaco Inc., and Lois E. Gold, Los Angeles, Cal., Union Oil Co. of California, were on the brief for producer intervenors. Edward J. Kremer, Dallas, Tex., Atlantic Richfield Co., Carolyn S. Hazel, Houston, Tex., Conoco Inc., Martin N. Erck, Houston, Tex., and Joseph G. Stiles, Washington, D.C., Exxon Corp., Bernard A. Foster, III, Washington, D.C., Getty Oil Co., Charles J. McClees, Jr., Houston, Tex., Mobil Oil Corp. and Gordon Gooch, Washington, D.C., Tenneco Oil Co., also entered appearances, for producer intervenors.
 
 
 2
 William T. Benham, Houston, Tex., entered an appearance for intervenor, Amoco Production Co.
 
 
 3
 Albert D. Hoppe, Dallas, Tex., entered an appearance for intervenor, Arco Oil and Gas Co.
 
 
 4
 Karol Lyn Newman, Washington, D.C., entered an appearance for intervenor, Laclede Gas Co.
 
 
 5
 Bernard A. Foster, III, Washington, D.C., entered an appearance for intervenor, Louisiana Land and Exploration Co.
 
 
 6
 George J. Meiburger, Frank X. Kelly, Washington, D.C., and John B. Will, Omaha, Neb., entered appearances for intervenor, Northern Natural Gas Co.
 
 
 7
 Raymond N. Shibley, Brian D. O'Neill and L. Charles Landgraf, Washington, D.C., entered appearances for intervenors, Panhandle Eastern Pipe Line Co., et al.
 
 
 8
 Christopher T. Boland, Washington, D.C., and J. Derrill Cody, Owensburg, Ky., entered appearances for intervenor, Texas Gas Transmission Corp.
 
 
 9
 William J. Grove, Jr., Washington, D.C., entered an appearance for intervenor, Valero Transmission Co.
 
 
 10
 Philip J. Mause, Washington, D.C., Norman A. Pedersen, Peggy Kobacker Shiffrin, Los Angeles, Cal., and Steven M. Schur, Madison, Wis., were on the brief for amicus curiae; The Public Service Commission of Wisconsin supporting reversal.
 
 
 11
 Before ROBINSON, Chief Judge, and MIKVA and SCALIA, Circuit judges.
 
 
 12
 Opinion for the Court filed by Circuit Judge MIKVA.
 
 MIKVA, Circuit Judge:
 
 13
 The petitioners in this action, numerous natural gas transmission and distribution companies and their respective trade associations, seek review of a final rule of the Federal Energy Regulatory Commission (FERC or Commission). That rule establishes a new approach to measuring the energy content of natural gas for the wellhead pricing purposes of the Natural Gas Policy Act of 1978 (NGPA), 15 U.S.C. Secs. 3311-3333 (Supp. V 1981). Specifically, the new rule requires that the energy content of natural gas be measured under the varying, relatively "dry" conditions at which gas is delivered for sale instead of the uniform, water-vapor saturated, "wet" condition under which the Commission had previously determined the energy content of gas. The petitioners argue that the new rule, by defining energy content in a way unforeseen by Congress, effectively raises the wellhead prices of natural gas above the maximum ceiling prices established by Congress in the NGPA. Alternatively, the petitioners argue that the rule was adopted without adequate notice and comment under the Administrative Procedure Act; was impermissibly given retroactive effect; and failed to guarantee wholesale gas purchasers automatic pass through of any retroactive payments they may be forced to make. We agree that the rule violates the NGPA's statutory pricing scheme and accordingly vacate the Commission's rule.
 
 I. BACKGROUND
 
 14
 A. Technical and Historical Background of the "Wet" Rule
 
 
 15
 The energy content of natural gas is measured in terms of British thermal units (Btu's), each Btu representing the amount of energy needed to raise the temperature of one pound of water one degree Fahrenheit, see Texaco, Inc., 33 F.P.C. 1228, 1240 n. 5 (1965). The Btu content of any given stream of natural gas will vary, however, depending on the gas' particular mix of combustible and noncombustible constituents. Natural gas is primarily composed of combustible hydrocarbons such as methane, propane, butane, ethane, and natural gasoline. Yet, natural gas contains small amounts of noncombustible substances as well. Of particular importance to the present case is the fact that natural gas often contains relatively small amounts of water vapor. See FERC Order 93-A, Technical Appendix, reprinted in Joint Appendix (JA) 59, 63, 73. Because water vapor contains no available heat energy, its presence in any given volume of natural gas will reduce the Btu content of the gas by displacing energy-producing hydrocarbons. Id. at 61.
 
 
 16
 Prior to the passage of the NGPA, the Commission (and its predecessor, the Federal Power Commission) measured the Btu content of natural gas for the purpose of making "quality adjustments" to the gas rates set by the Commission under the Natural Gas Act of 1938 (NGA), 15 U.S.C. Secs. 717a-717w (1976 & Supp. V 1981). Although the varying amounts of water vapor in natural gas streams could affect the gas streams' relative Btu values, the Commission sought to factor out this relatively small variable--to ensure ease of measurement and consistency among samples--by determining Btu content under laboratory conditions that standardized the amount of water vapor at a convenient, albeit arbitrary, level. See Government Brief at 5 n. 9 & 8 n. 12. Specifically, the Commission promulgated a rule requiring the Btu content of a gas stream to be determined on the basis of a test volume of gas (1.0 cubic foot), saturated with water vapor at a specified, conveniently obtained temperature and pressure (60? F. and 30 inches of mercury). See 18 C.F.R. Secs. 2.56a(c)(1), 2.56b(d)(1) (1982) (post- and pre-1973 gas, respectively). This rule was known as the "wet" rule because it required the gas sample to be saturated with water vapor at a temperature and pressure combination where the capacity of natural gas to absorb water vapor is markedly higher than that existing at the temperature and pressure conditions under which most natural gas is sold. In practical effect, therefore, the wet rule tended to overstate water vapor content for gas which, when actually delivered, was neither saturated with water vapor nor delivered at the "standard" temperature or pressure. See FERC Order 93-A, Technical Appendix, reprinted in JA 63. This overstated water vapor content, in turn, caused an understatement in the number of Btu's assumed to be in the test sample of natural gas.
 
 
 17
 Despite its relative inaccuracy, however, the Commission's "wet" Btu determination enjoyed the advantages of widespread industry acceptance and consistent agency implementation. Originally proposed in a policy statement during the Commission's administration of gas rates under the Natural Gas Act, see 26 Fed.Reg. 4,614 (1961), the wet rule was expressly sanctioned by the Commission in Texaco, Inc., 33 F.P.C. 1228 (1965), in which the Commission noted that the rule was accepted by the American Society for Testing Materials and the natural gas industry as a whole, id. at 1236-37. See also Sunray DX Oil Co., 29 F.P.C. 1079 (1963). The wet rule was carried forward into the Commission's area rate proceedings under the NGA, see Area Rate Proceeding (Southern Louisiana Area), 46 F.P.C. 86, 143-44 (1973); Area Rate Proceeding, Docket No. AR61-1, 34 F.P.C. 159, 223-24 (1965), and into its national rate proceedings under the NGA as well, see National Rates for Jurisdictional Sales of Natural Gas, 56 F.P.C. 2698 (1976); Just and Reasonable National Rates for Sales of Natural Gas, 54 F.P.C. 3090 (1975); Just and Reasonable National Rates for Sales of Natural Gas, 52 F.P.C. 1604, 1630, 1651-52 (1974). Indeed, in its first national rate proceeding, the Commission specifically rejected an argument by natural gas producers that, because gas generally is sold to pipelines and distribution companies in a much "drier" condition than that defined in the wet rule, the Commission should adopt a more accurate "as delivered" or "dry" definition of Btu content:
 
 
 18
 The Producers argue that the heating content (Btu) 'of the gas should be adjusted for the water vapor content in the gas as it is delivered.' In Texaco, Inc., the Commission determined that Btu adjustments should be made on the saturated basis. This is the basis which was utilized in the area rate proceedings, and is the basis that will be adopted in this proceeding.
 
 
 19
 52 F.P.C. at 1630.
 
 
 20
 Thus, at the time Congress passed the NGPA in 1978, the Btu content of natural gas had been defined by the Commission in terms of a standardized, saturated condition for over fifteen years. As codified in the Commission's rules of practice, the wet rule provided:
 
 
 21
 The Btu content of the natural gas used in computing this rate adjustment [under the NGA] shall be the number of British thermal units (Btu) produced by the combustion, at constant pressure, of the amount of the gas which would occupy a volume of 1.0 cubic foot at a temperature of 60? F. saturated with water vapor and under a pressure equivalent to that of 30.00 inches of mercury at 32? F. and under standard gravitational force (980.665 centimeters per second squared) with air of the same temperature of the gas and air and when the water formed by combustion is condensed to the liquid state.
 
 
 22
 18 C.F.R. Secs. 2.56a(c)(1), 2.56b(d)(1) (1982) (emphasis added). The precise language of the wet rule becomes an important reference point for the petitioners' procedural objections to the Commission's post-NGPA change of course.
 
 B. The Procedural History of the "Dry" Rule
 
 23
 Title I of the NGPA establishes a detailed scheme of maximum ceiling prices for various categories of natural gas sold to pipelines and local distribution companies. Although these maximum "wellhead," or "first sale," prices vary among different categories, the NGPA expresses the price of each category on a "per million Btu" (per MMBtu) basis. Thus, for example, section 108 of the Act sets a maximum lawful price for "stripper well" gas at $2.09 per MMBtu as of May 1978 (subject to small, monthly adjustments thereafter for inflation and real growth) and section 109 of the Act sets a maximum price for certain gas produced from Prudhoe Bay, Alaska at $1.45 per MMBtu as of April 1977 (as adjusted monthly, thereafter, for inflation). See 15 U.S.C. Secs. 3318, 3319 (Supp. V 1981). Because the prices for all of the NGPA's categories of gas are expressed per MMBtu, the Commission felt it necessary to specify, in its regulations, how Btu content was to be determined. In doing so, the Commission abandoned the "wet" measurement of Btu's that it had used under the NGA (and indeed still uses for NGA purposes not displaced by the NGPA). In its place, the Commission adopted an "as delivered" rule that measured the Btu content of gas at the conditions under which natural gas is actually delivered for first sales. Because natural gas generally contains far less water vapor under actual delivery conditions than under the saturated, laboratory conditions specified in the wet rule, we refer to the Commission's new rule as the "dry" rule.
 
 
 24
 The Commission's transition from the wet to the dry rule was heralded by considerable confusion. The NGPA's pricing scheme became law on November 9, 1978, with an effective date of December 1, 1978. Because of the shortness of time in which to devise implementing regulations, FERC decided to promulgate interim regulations on an expedited basis and to revise them, if needed, at a later date. Accordingly, the Commission issued a notice of proposed rulemaking on November 14, 1978; considered all comments received by November 20; and issued its interim regulations on November 29. See Notice of Proposed Rulemaking in Docket No. RM79-3, 43 Fed.Reg. 53,270 (1978). The notice also provided for a subsequent, sixty-day comment period on the interim regulations, to form the basis for any appropriate revisions. Id.
 
 
 25
 Among the proposed regulations considered during this expedited interim rulemaking was the Commission's dry rule, designated as section 270.204 of the proposed interim regulations. As originally proposed, however, the Commission's dry rule appeared virtually identical to its long-established wet rule. Proposed section 270.204 provided:
 
 Btu content per unit volume of natural gas
 
 26
 For purposes of determining the number of Btu's per unit volume of natural gas, the Btu content of one cubic foot of natural gas is the number of Btu's produced by the combustion, at constant pressure, of the amount of gas which would occupy a volume of 1.0 cubic foot at a temperature of 60 degrees Fahrenheit, saturated with water vapor, and under a pressure equivalent to that of 30.00 inches of mercury at 32 degrees Fahrenheit, and under standard gravitational force (980.665 centimeters per second squared) with air of the same temperature and pressure as the gas, when the products of combustion are cooled to the initial temperature of the gas and air and when the water formed by combustion is condensed to the liquid state.
 
 
 27
 43 Fed.Reg. at 53,333 (1978) (emphasis added); compare 18 C.F.R. Sec. 2.56a(c)(1) (quoted supra page 11). Nothing in the prefatory statement accompanying the Commission's proposed regulation gave any indication that section 270.204 constituted a change from the virtually identical text of the Commission's wet rule. The Commission's only explanation of section 270.204 was that it "presents the technical information necessary to determine the number of British thermal units (Btu's) per unit volume of natural gas. This is necessary because maximum lawful prices for first sales of natural gas are stated in terms of dollars per million Btu's." 43 Fed.Reg. at 53,280. No comments were received on the proposed rule during the one-week comment period and, on November 29, 1978, the identical text of the proposed rule was issued as interim regulation 270.204. See 43 Fed.Reg. at 56,448.
 
 
 28
 The subsequent sixty-day comment period on the interim regulation was more lively. During this period, the gas-producing companies which are intervenors in the present case filed written comments objecting to what they perceived to be the water-vapor saturation requirements of interim regulation 270.204:
 
 
 29
 Section 270.204--According to this section, the Btu content of natural gas is to be determined "saturated with water vapor." The result of this "special rule" may be to unlawfully deny producers the right to collect the full statutory rates under the NGPA. By fixing the price on an MMBtu basis, Congress intended that the maximum lawful price should be paid for the gas as delivered by the producer, not as adjusted by regulation.
 
 
 30
 Joint Supplemental Comments of Indicated Producers, filed Jan. 31, 1978, at 6-7, reprinted in Brief of Producer Intervenors, Appendix A at A-1 to A-2. On the basis of comments such as these, the producers filed a petition for rehearing concerning the interim regulations with the Commission in February 1979. See Application of Indicated Producers for Rehearing, FERC Docket No. RM79-3, filed Feb. 2, 1979. On April 19, 1979, however, the Commission denied this application without comment. See Order Granting in Part and Denying in Part Applications for Rehearing of the Interim Regulations, reprinted in Brief of Producer Intervenors, Appendix A at A-5 to A-9. Thereafter, the producers filed for judicial review of interim regulation 270.204 in the United States Court of Appeals for the Fifth Circuit. See Ecee, Inc. v. FERC, 645 F.2d 339 (5th Cir.1981).
 
 
 31
 On July 16, 1980, almost eighteen months after promulgating interim section 270.204, FERC issued Order 93, adopting the interim regulation as a final regulation, albeit parsing the final text of the regulation into a slightly different format:
 
 
 32
 Interim regulation Sec. 270.204 is adopted as a final rule
 
 
 33
 Sec. 270.204 Btu content per cubic foot of natural gas
 
 
 34
 (a) Measurement. The Btu content of one cubic foot of natural gas under the standard conditions specified in paragraph (b) of this section is the number of Btu's produced by the complete combustion of such cubic foot of gas, at constant pressure with air of the same temperature and pressure as the gas, when the products of combustion are cooled to the initial temperature of the gas and air and when the water formed by such combustion is condensed to a liquid state.
 
 
 35
 (b) Standard conditions. The standard conditions for purposes of paragraph (a) of this section are as follows: The gas is saturated with water vapor at 60 degrees Fahrenheit under a pressure equivalent to that of 30.00 inches of mercury at 32 degrees Fahrenheit, under standard gravitational force (980.665 centimeters per second squared).
 
 
 36
 FERC Order No. 93, Final Rule, July 16, 1980, reprinted in JA 24 (emphasis added). Although the terms of the final rule tracked, almost verbatim, the terms of the interim rule, the Commission surprised all of the parties in this case by announcing in the "Summary" section of Order 93 that the Btu values obtained under section 270.204 were to be "converted" to figures that reflected the actual water vapor condition of natural gas on delivery:
 
 
 37
 Several comments noted that Sec. 270.204 provides that Btu content must be measured on a "saturated with water vapor" basis rather than on the basis of the actual water vapor content of the gas as delivered. The comments asserted that under this rule the seller would be paid for less Btu's than would actually be delivered if the gas were sold on a dry (unsaturated) basis.
 
 
 38
 This assertion is erroneous. Section 270.204 merely describes the test standard for expressing the number of Btu's contained in a cubic foot under certain conditions. Under this standard, the heat value is expressed as the number of Btu's per cubic foot of gas "saturated with water vapor." The Commission is aware that the water vapor content or pressure of the gas when tested may be different than described in this standard, and may also be different than the conditions that obtain when the gas is delivered. Therefore, the results obtained under test conditions, be they those in the rule or otherwise, must be converted to figures that reflect the actual condition of the gas on delivery in order to properly price the gas.
 
 
 39
 FERC Order 93, supra, at JA 15-16 (emphasis added).
 
 
 40
 Although Order 93 rendered moot the "wet rule" issue in the producers' petition for review in the Fifth Circuit's Ecee case, it set off a flurry of applications for rehearing by most of the pipeline and gas distribution companies which are presently petitioners in this case. The Commission denied all of these applications for rehearing in Order 93-A, April 24, 1981, reprinted in JA 30. In Order 93-A, the Commission for the first time articulated the rationale behind Order 93's controversial explanation of section 270.204. Essentially, the Commission's position was that the NGPA's Btu-based pricing scheme required (1) a more accurate method of measuring Btu's than was required under the old NGA scheme, and (2) a method of measuring Btu's in a volume of gas at "delivery conditions" instead of at "standard conditions." See Order 93-A, supra, at JA 42-49. To explain why the language of section 270.204 specified these "standard conditions" in the first place, the Commission cryptically stated:
 
 
 41
 [Section 270.204] merely describes the standard conditions under which the number of MMBtu's in a volume of natural gas is measured. However, recognizing that actual delivery conditions vary widely and are most often different from the defined standard conditions ... the results of Btu measurements at the defined standard conditions must be adjusted to account for actual delivery conditions.
 
 
 42
 Order No. 93-A, supra, at JA 32-33. The Commission further stated that its newly explained "as delivered" method of determining Btu content could be made by any reasonable method. JA 55. Moreover, the Commission concluded, because Order 93 had merely "clarified" interim section 270.204, and had not substantively changed it, the effective date of the final dry rule was December 1, 1978 (the effective date of the interim rule) and not September 22, 1980 (the effective date of Order 93). See JA 57. Because the December 1, 1978 effective date could result in retroactive payments in the millions of dollars from pipeline and gas distribution companies to gas producers, the Commission specifically provided that pipeline and distribution companies could demonstrate that pass through charges to their customers (rate treatment) would be "appropriate" for any claimed retroactive payments. See JA 58.
 
 
 43
 In response, some pipeline and distribution companies petitioned the Commission for rehearing of Order 93-A and requested a stay of its retroactive application. These petitions were denied on July 30, 1981. See Order Denying Applications for Rehearing of Order 93-A and Limited Stay of Order Nos. 93 and 93-A, reprinted in JA 89. In June and July 1981, the petitioners filed their petitions for judicial review in this court and, on August 6, 1981, one of the petitioners (Lone Star Gas Company) moved this court for a stay of the dry rule's retroactive application pending a judicial determination on the merits. Before this court could rule on the motion, the Commission sua sponte asked for a remand of the record to reconsider the issue of the dry rule's effective date and temporarily stayed the rule's retroactive application pending the Commission's reconsideration. This court allowed remand of the record to the Commission in September 1981, but in December of that same year, the Commission issued an Order reaffirming the dry rule's December 1, 1978 effective date. See Order Vacating Partial Stay and Amending Regulations, JA 126. In this Order, however, the Commission amended the language of section 270.204 by adding a new subsection (c):
 
 
 44
 (c) Application of the maximum lawful price. The maximum lawful price prescribed by the NGPA and this part for any first sale of natural gas applies to the Btu's actually delivered in that first sale.
 
 
 45
 JA 133. Because the Commission considered this amendment to be merely anoth er "clarification" of the regulation, it concluded that public notice and comment were unnecessary. JA 131.
 
 C. The Parties' Arguments
 
 46
 The primary arguments in this case address two broad questions: (1) whether the NGPA's pricing scheme allows or requires the Commission to promulgate a dry definition of Btu content; and (2) if so, whether the Commission's promulgation of section 270.204 afforded the petitioners adequate notice and opportunity to comment. The petitioners maintain that the NGPA does not allow the Commission to adopt a dry definition of Btu content. They support this position with excerpts from the Act's legislative history suggesting indirect congressional endorsement of the wet rule; supplementally, they point to the absence of congressional criticism of the wet rule as indicating congressional intent to leave the definition of Btu content as it was. In the alternative, the petitioners argue that they were deprived of a meaningful opportunity to comment on the dry rule because the Commission's notice of proposed rulemaking and the "wet" text of interim section 270.204 failed to indicate to the public that a dry rule was even under consideration. Finally, the petitioners complain that the Commission violated their constitutional right to due process by giving retroactive effect to the dry rule--which was announced, at the earliest, in Order 93 on July 16, 1980--as of the NGPA's effective date, December 1, 1978. This retroactive application is compounded, the petitioners add, by FERC's refusal to guarantee pipelines and distribution companies automatic pass through to their customers, under section 601 of the NGPA, 15 U.S.C. Sec. 3431 (Supp. V 1981), of any retroactive "dry Btu" payments that the companies may now be forced to make to natural gas producers.
 
 
 47
 In response, the Commission posits that its dry definition of Btu content is consistent with the NGPA's pricing scheme and deserves judicial deference. Specifically, the Commission argues that Congress impliedly displaced the inaccurate wet rule by choosing a Btu-based pricing scheme; such a scheme, the Commission concludes, evidences congressional intent to measure Btu's on a more accurate "dry" or "as delivered" basis. Moreover, because its dry rule merely articulates this implicit legislative intent, the Commission maintains that the rule is an "interpretative" rule, outside of the notice and comment requirements of the Administrative Procedure Act (APA), 5 U.S.C. Sec. 553(b)(c) (1976). Concomitantly, the Commission maintains that its interpretative rule should be given the same December 1, 1978 effective date as the statute that it interprets. In the alternative, the Commission suggests that its notice of proposed rulemaking and the text of its interim rule sufficed to notify petitioners adequately that the subject of Btu measurement was under agency review. Assuming that its dry rule was a properly promulgated but non-interpretative rule, the Commission would still justify the rule's application as of December 1, 1978 because the harm of depriving natural gas producers of their congressionally-allowable prices is claimed to be greater than the harm to pipeline and distribution companies, which assertedly can pass through any legitimate, retroactive payments to their customers. The Commission insists that its refusal to "guarantee" pass through is not meant to deprive the pipelines and distribution companies of pass through under section 601. Rather, the Commission's refusal is said merely to allow pass through on a case-by-case basis, to ensure that all passed through charges are not "excessive due to fraud, abuse or similar grounds," as provided in section 601(c)(2), 15 U.S.C. Sec. 3431(c)(2) (Supp. V 1981).
 
 
 48
 The intervenors in this case are twenty-three energy-producing companies. The intervenors take the position that the Commission's dry rule is required by the NGPA; that it is an interpretative rule outside of the APA's notice and comment provisions; and, alternatively, that it is a reasonable legislative rule, promulgated with adequate notice and comment. In addition, the intervenors have moved to dismiss one of the petitioners, Lone Star Gas Company (Lone Star), for lack of jurisdiction. Specifically, the intervenors claim that Lone Star's failure to petition the Commission for rehearing of the final day rule within 30 days of the rule's promulgation in Order 93 precludes it from seeking judicial review of that Order given the jurisdictional prerequisite established in section 506 of the NGPA, 15 U.S.C. Sec. 3416(a)(2) (Supp. V 1981) (denying standing to seek judicial review to any person aggrieved by an order of the Commission who failed to petition for agency rehearing within 30 days after issuance).
 
 II. DISCUSSION
 
 49
 As a threshold matter, we consider the petitioners' contention that the language and legislative history of the NGPA do not allow the Commission to adopt a "dry" definition of Btu content. Should the petitioners prevail in this contention, it would not be necessary to reach the notice and comment, retroactivity, or pass through issues. In evaluating the petitioners' position, and concomitantly the Commission's (and producer-intervenors') contrary view of the statute, it is our responsibility to measure the parties' arguments in light of the language, legislative history, purpose, and structure of the NGPA, according the Commission the traditional respect due an agency's interpretation of the statute it is called upon to enforce.
 
 
 50
 We begin our analysis by considering the statute's language; "[t]he starting point in every case involving construction of a statute is the language itself." International Brotherhood of Teamsters v. Daniel, 439 U.S. 551, 558, 99 S.Ct. 790, 795, 58 L.Ed.2d 808 (1979). In the present case, however, the dearth of statutory references to water vapor/Btu content calls forth Justice Frankfurter's guidance: "One more caution is relevant when one is admonished to listen attentively to what a statute says. One must also listen attentively to what it does not say." Frankfurter, Some Reflections on the Reading of Statutes, 47 Colum.L.Rev. 527, 536 (1947). The NGPA does not expressly provide for either a wet or a dry determination of Btu content. Although ceiling prices for virtually every category of natural gas are set on a "per MMBtu" basis, see 15 U.S.C. Secs. 3312-3319 (Supp. V 1981), the statute merely defines the term "Btu" to mean "British thermal units," 15 U.S.C. Sec. 3301(30).
 
 
 51
 Undaunted by the lack of statutory text, some of the parties seek to quarry congressional intent from Congress' silence. The petitioners, for example, argue that Congress, having not spoken to the Btu measurement issue, "cannot be held to have required a change in the long-standing practice of measuring Btu content on a saturated basis." See, e.g., Brief of Petitioners Michigan Wisconsin Pipe Line Company, et al. (Michigan Wisconsin Brief) at 24. In response, the producer-intervenors insist, "[h]ad Congress intended to preserve the imprecise water saturation assumption ... it could easily have done so in [the definitional section] of the NGPA." Brief of Producer Intervenors at 14. These thrusts and parries, however, reflect a duel of wooden maxims that has little discernible relationship to the meaning of the NGPA. However revealing congressional acquiescence in administrative action may be in more pointed, focused contexts, see, e.g., Bob Jones University v. United States, --- U.S. ----, 103 S.Ct. 2017, 76 L.Ed.2d 157 (U.S.1983), there are no indications in the NGPA's legislative history to suggest that Congress' failure to define expressly Btu content indicates, by itself, a conscious policy preference for either the wet or the dry rule. The wisdom of Justice Frankfurter's admonition to consider what a statute fails to say should not be taken as a cue for sloganeering; generally, the use of canons of construction are appropriate when they aid, rather than displace, the search for statutory meaning. Cf. Note, Intent, Clear Statements, and the Common Law: Statutory Interpretation in the Supreme Court, 95 HARV.L.REV. 892, 903 (1982) (rules of construction should not blindly substitute for appropriate inquiry into statutory purpose).
 
 
 52
 Both the Commission and intervenors suggest that the "as delivered" rule is re quired by the NGPA's repeated reference to "natural gas delivered during any month." See 15 U.S.C. Secs. 3312(a), 3313(a), 3314(a), 3315(a), 3316(a), 3317(a), 3318(a), 3319(a) (Supp. V 1981) (emphasis added). We find this reading to be without foundation. Nothing in the NGPA's language or legislative history links the phrase, "delivered during any month," to a particular type of Btu measurement. Rather, the statute focuses on the month of "delivery," as opposed to the date of the sale or the date of the natural gas contract, to determine the proper month for applying the appropriate ceiling price and accompanying monthly inflation and growth adjustments. See 15 U.S.C. Sec. 3311(b)(4) (Supp. V 1981) ("The maximum lawful ceiling prices under this subchapter ... (B) shall apply to the month of delivery without regard to the date of the sale or the date of the contract under which the sale occurs ...."). Thus, for example, section 3312 provides that the maximum lawful price of new gas "delivered during any month " shall be:
 
 
 53
 (1) $1.75 per million Btu's, in the case of April 1977; and
 
 
 54
 (2) in the case of any month thereafter, the maximum lawful price, per million Btu's, prescribed under this subsection for the preceding month multiplied by the monthly equivalent of a factor equal to the sum of--
 
 
 55
 (A) the annual inflation adjustment factor applicable for such month; plus
 
 
 56
 (B) (i) .035, in the case of any month beginning before April 20, 1981; or
 
 
 57
 (ii) .04, in the case of any month beginning after April 20, 1981.
 
 
 58
 15 U.S.C. Sec. 3312(a), (b) (Supp. V 1981) (emphasis added). The very particularity with which Congress identifies the price adjustments attending the month of delivery (to the thousandth's place, in some instances) makes it extremely unlikely that Congress would use the phrase, "delivered during any month," without further specification, to denote obliquely a change from the wet to the dry method of measuring Btu's--a change which, we are told, may affect the overall amounts paid for natural gas by the hundreds of millions of dollars. In short, the Commission fails to convince us of any necessary connection between the delivery point at which the price of gas is fixed and a "dry" determination of Btu content. Indeed, the Commission itself has established that a "wet" measurement of Btu content was properly used during rate determinations under the NGA, despite the fact that the underlying NGA commodity unit was also measured on an "as delivered" basis. See Order 93-A at 13, reprinted in JA 42. ("Although the commodity priced was volume rather than heating value, the NGA, too, priced the commodity on an as-delivered basis.").
 
 
 59
 The Commission's argument thus boils down to the shift from the commodity unit under NGA ratemaking where gas was priced by volume, per thousand cubic feet (Mcf), to the new energy-content basis under the NGPA, per MMBtu. In the Commission's view, the NGPA's use of a Btu-based pricing scheme puts a premium on accurate Btu measurement that cannot be squared with the water-vapor assumptions of the Commission's longstanding wet rule. This is alleged to be so for two reasons. First, the Commission suggests, "Title I of the NGPA meticulously establishes a detailed pricing scheme for enumerated categories of natural gas," under which Congress could not have intended "to adopt a method of price calculation that leads to inaccurate results." Brief for Respondent FERC at 19, 20. Second, FERC adds, inaccurate measurement of the Btu content of natural gas would distort the intent of the NGPA to set ceiling prices for natural gas in reference to the Btu content of other fuels. See id. at 21 n. 22. Neither of these two arguments withstands scrutiny.
 
 
 60
 There is no question but that the pricing scheme of the NGPA reflects the meticulous detail to which the Commission refers. But it is precisely the detail of this scheme that undermines the Commission's position. Originally introduced as the keystone of President Carter's National Energy Act, the NGPA emerged as a complex compromise between two radically different House- and Senate-passed bills. Compare H.R. 6831, 95th Cong., 1st Sess., 123 Cong.Rec. 13,184 (1977) (original bill in House) and S. 1469, 95th Cong., 1st Sess., 123 Cong.Rec. 13,730 (1977) (original bill in Senate) with H.R. 8444, 95th Cong., 1st Sess. (1977) (House-passed bill mandating permanent price controls on intra- and inter-state sales) and S. 2104, 95th Cong., 1st Sess. (1977) (Senate-passed bill exempting intrastate sales from regulation and deregulating new onshore and offshore gas within two and five years, respectively). See generally Note, Legislative History of the Natural Gas Policy Act: Title I, 59 TEX.L.REV. 101, 106-16 (1980). The compromise bill combines price control and deregulation in a statutory scheme that creates nationwide incentive-based price ceilings for categories of gas at the margin of supply (such as "new," "high-cost," and "stripper well" gas); that retains various "just and reasonable" rates as the basis for price ceilings on "old" gas; and that imposes interim price controls on intrastate gas. Although the NGPA provides for phased deregulation of many of these categories of gas, Congress established the Act's interim, as well as permanent, price ceilings to the penny. The maximum lawful prices of various categories of gas are congressionally fixed in either specified dollar amounts or else in terms of their "just and reasonable" rates as of a date certain under the NGA. Compare 15 U.S.C. Secs. 3312, 3313, 3317, 3318 (Supp. V 1981) (setting specific dollar amounts) with id. Secs. 3314, 3316(a) (incorporating NGA "just and reasonable" rates). See Public Service Commission of New York v. Mid-Louisiana Gas Company (Mid-Louisiana Gas), --- U.S. ----, ----, 103 S.Ct. 3024, 3033, 77 L.Ed.2d 668 (U.S.1983) ("Title I ... establishes an exhaustive categorization of natural gas production and sets forth a methodology for calculating an appropriate ceiling price within each category"). Given that both the Commission and the producer-intervenors agree that the Btu content of natural gas is an integral part of each of the prices established in the NGPA, see Brief for Respondent FERC at 22 ("It cannot be denied ... that the new statute expressly provides that heat content of natural gas determines its price"); Brief of Producer Intervenors at 16 (acknowledging that different methods of measuring Btu's can effectively raise or lower the NGPA's ceiling prices), it is most logical, for several reasons, to assume that Congress fixed these prices based on the "wet" method of measuring Btu's.
 
 
 61
 First, the wet rule establishes the only method of measuring Btu's with which Congress was likely to have been familiar. At the time Congress passed the NGPA, the Btu content of natural gas had been defined by the Commission in terms of a standardized, saturated condition for over fifteen years. See discussion supra pp. 10-11. Moreover, the wet rule was the only method of measuring Btu's that was even tangentially acknowledged in the NGPA's legislative history. In the House committee report accompanying H.R. 8444, one of the NGPA's forerunner bills, the House Committee on Interstate and Foreign Commerce explained the bill's incorporation of "the just and reasonable price established by the Commission" by stating that "[t]he reference to ... just and reasonable prices and contract prices for purposes of determining maximum lawful prices under section 405 incorporates Btu adjustments and other quality adjustments provided for in FPC rate determinations or in the the applicable contract." H.R. REP. NO. 496, Part 4, 95th Cong., 1st Sess. 103 (1977), U.S.CODE CONG. & ADMIN.NEWS 1978, pp. 8173, 8547 (emphasis added). Although the final version of the NGPA differed in many respects from H.R. 8444, the concept of incorporating the Commission's "just and reasonable" rates for certain categories of gas was carried over into the final version of the Act, see, e.g., 15 U.S.C. Secs. 3314, 3316(a) (Supp. V 1981). In explaining this incorporation, the House conference report referred to "the just and reasonable rates that were in effect on April 20, 1977 as converted, if necessary, to a million Btu basis...." H.R.Rep. No. 1752, 95th Cong., 2d Sess. 82 (1978), reprinted in 1978 U.S.CODE CONG. & AD.NEWS 8983, 8998 (emphasis added). We read the qualifier, "as converted, if necessary, to a million Btu basis," to assume that it would not be necessary to convert those contract prices established under the NGA that may already have been expressed on a "per million Btu" basis. See, e.g., id. at 85, reprinted in 1978 U.S. CODE CONG. & AD.NEWS at 9001 (referring to the NGA as setting the "just and reasonable" price of gas under interstate rollover contracts at "55cents/MMBtu's for the second half of 1978.") (emphasis added). Given that such prices would have had to comport with the NGA's longstanding wet rule, the report of the conference committee, like that of the committee report accompanying H.R. 8444, indicates at least indirect congressional incorporation of the wet rule into the NGPA's price structure. In contrast to this evidence of congressional familiarity with the pre-NGPA method of measuring Btu's, there is absolutely no evidence of congressional awareness of any alternative "dry" or "as delivered" methods. Under a statutory scheme in which Congress establishes definite prices for various categories of gas, and in which price adjustments for inflation and real growth are often expressed to the thousandth's place (see supra p. ----), the Commission's attribution to Congress of a price component with which it was wholly unfamiliar is unreasonable.
 
 
 62
 We reject the Commission's dry rule for a second reason: it severely overstates the significance of Congress' shift to the MMBtu basis of pricing natural gas and accordingly distorts the ceiling prices that Congress intended to establish. Throughout its Order explaining the statutory rationale for the dry rule, the Commission repeatedly emphasizes that, by choosing the "MMBtu" commodity unit in the NGPA, Congress necessarily rejected the NGA's use of the "Mcf" commodity unit and all that went with it--including the "wet" method of measuring Btu's for the purpose of making Btu quality adjustments in the price. See, e.g., Order No. 93-A, supra, at 32-33, 45-48. Such a sweeping conclusion is belied, however, by the NGPA's legislative history. Specifically, there is considerable evidence that Congress may have assumed the "Mcf" and "MMBtu" commodity units to be, in many respects, equivalent. We note, for example, that the ceiling price for "new" gas established in section 102 of the NGPA, $1.75 per MMBtu, tracks President Carter's originally submitted bill, which proposed that the price for "new" gas be set at $1.75 per Mcf. Compare 15 U.S.C. Sec. 3312 (Supp. V 1981) with White House Fact Sheet 16 (April 20, 1977), reprinted in I LEGISLATIVE HISTORY OF THE NATIONAL ENERGY ACTS OF 1978, Item 1 at 16 (1979). Similarly, the $0.54 per MMBtu price of interstate rollover gas established in 15 U.S.C. Sec. 3316(a)(2)(A) (Supp. V 1981) appears to track exactly the $0.54 per Mcf price, for the same type and age of gas, derived from Just and Reasonable National Rates for Sales of Natural Gas, 52 F.P.C. 1604 (1974). And two of the NGPA's floor managers, Senator Jackson and Representative Dingell, both indicated their belief that the $1.45 per MMBtu price of section 109(b) derived directly from the $1.45 per Mcf price of identical gas established under the Commission's Opinion 770-A, National Rates for Jurisdictional Sales of Natural Gas, 56 F.P.C. 2698 (1976). See 124 Cong.Rec. H13,117 (daily ed. Oct. 14, 1978) (statement of Representative Dingell); 124 Cong.Rec. S15,020-21 (daily ed. Sept. 13, 1978) (statement of Senator Jackson). From this legislative history, we abstract only the likelihood that Congress may well have assumed that the "Mcf" and "MMBtu" bases of natural gas pricing were far more interchangeable than the Commission realized in its abandonment of the wet rule. Accordingly, we cannot accept the Commission's position that the NGPA's use of an "MMBtu" price represents so drastic a shift that all aspects of "Mcf" prices--such as the wet rule--were necessarily rejected. Such a position derives from assumptions at odds with those used by Congress in establishing the precise ceiling prices at issue in this case. Cf. Mid-Louisiana Gas, --- U.S. at ---- n. 12, 103 S.Ct. at 3033 n. 12 (although NGPA generally meant to displace Commission's regulatory authority under NGA, "[f]or some (but not all) old gas, the NGA price is preserved as an initial ceiling price"). Moreover, the Commission's position is difficult to reconcile with those sections of the NGPA authorizing the Commission to prescribe higher ceiling prices, in limited circumstances, provided that the new prices are "just and reasonable within the meaning of the Natural Gas Act." See, e.g., 15 U.S.C. Secs. 3314(b)(2), 3316(c), 3319(b) (Supp. V 1981). Given that the wet rule continues to govern the Commission's practice under the NGA, it would appear that only a "wet" method of measuring Btu's would satisfy both the NGPA's authorization to set higher just and reasonable rates "within the meaning of the NGA" and its requirement that all gas be priced on an MMBtu basis.
 
 
 63
 Our concern with the assumptions underlying the NGPA's pricing scheme provides the basis for a third criticism of the Commission's "dry" interpretation of the Act. Specifically, the Commission argues that Congress chose MMBtu's as its commodity unit in order to reference the price of natural gas to the "Btu equivalency" of other fuels. A "wet" method of measuring Btu's would unjustifiably skew this inter-fuel comparison, the Commission concludes, by distorting the Btu measurement of natural gas with artificial assumptions about water vapor content that do not, in fact, exist. See Order No. 93-A, supra, JA 45-46. The Commission's conclusion suffers from two major weaknesses. First, the final version of the NGPA failed to carry over the provisions of the House- and Senate-passed predecessor bills which adjusted the wellhead price for natural gas in light of the "current Btu-related price" of domestic crude oil. Compare 15 U.S.C. Secs. 3311-3333 (Supp. V 1981) (final version of Title I) with H.R. 8444, 95th Cong., 1st Sess. Sec. 403 (1977) and S. 2104, 95th Cong., 1st Sess. Sec. 303 (1977) ("current Btu-related price" sections of NGPA's unenacted, predecessor bills). Given that the direct comparison between gas and oil Btu's was dropped from the final version of the statute, the Commission's emphasis on accurate inter-fuel comparisons loses much of its force. Second, moreover, the Commission's emphasis on hyper-accurate measurements finds little support from those inter-fuel Btu comparisons made in other statutory provisions enacted contemporaneously with Title I of the NGPA. Thus, for example, the committee report accompanying the Energy Tax Act of 1978, Pub.L. No. 95-618, 92 Stat. 3174-3205 (1978), refers to several "standard" assumptions made in determining the Btu equivalency of oil and gas for tax purposes: "To arrive at a Btu equivalency price for each million BTU's of natural gas, the price per barrel is divided by 5.8 million. (A thousand cubic feet of natural gas equals about 1 million BTUs)." H.R. REP. NO. 496, Part III, 95th Cong., 1st Sess. 97 (1977), U.S.Code Cong. & Admin.News 1978, pp. 8173, 8386. The apparent willingness of Congress to use a standard conversion factor of 5.8 million Btu's per barrel, as well as its generalization that one thousand cubic feet of gas (1 Mcf) contains approximately one million Btu's (1 MMBtu), suggests that Congress was not necessarily adverse to the use of "standard" assumptions underlying the wet rule. Indeed, the Commission itself has endorsed the use of standard assumptions in its implementation of section 204(e) of Title II of the NGPA, 15 U.S.C. Sec. 3344(e) (Supp. V 1981). Section 204(e) requires that the Commission determine the cost of alternative fuel (specifically, of Number 2 fuel oil) on an MMBtu basis. Yet, in its implementing regulations, the Commission adopted a standard conversion factor of 5.8 million Btu's per barrel of Number 2 fuel oil, and specifically rejected the suggestions of various commenters that the Commission adopt a specific adjustment factor to accommodate variations in the Btu content among different barrels of oil. See 44 Fed.Reg. 57,754, 57,770 (1979). To the extent that Congress' use of Btu's may be given effect by the use of various "standard" measurements in Title II of the NGPA and in the Energy Tax Act of 1978, there does not seem to be any necessary incompatibility between Congress' shift to MMBtu's in Title I of the NGPA and its use of the "standard" assumptions underlying the wet rule.
 
 
 64
 In sum, we find the Commission's dry rule to be inconsistent with the NGPA's language, structure, and legislative history. Although one of the purposes of the Act was to increase the financial incentives for producing various types of new gas, see Note, Legislative History of the Natural Gas Policy Act, supra, p. 25, at 116, Congress did not intend for the Commission to raise the effective wellhead price of gas as much as possible. Rather, Congress itself specified the maximum lawful prices of most categories of gas and authorized the Commission to raise those prices only in certain, very limited, circumstances. Cf. Pennzoil Co. v. FERC, 645 F.2d 360, 379 (5th Cir.1981), cert. denied, 454 U.S. 1142, 102 S.Ct. 1000, 71 L.Ed.2d 293 (1982) ("The balance Congress struck already took into account the conflicting interests of producers and consumers"). Given that the definition of Btu content is an integral part of the price structure chosen by Congress, see supra p. 26, the critical focus in this case involves the likely assumptions made by Congress in pricing natural gas on a "per MMBtu" basis. Thus, however more appealing the dry rule may be to the Commission's sense of scientific aesthetics and accuracy, it is not for the Commission to "improve" the statutory design chosen by Congress. The Commission's technical experience with measuring Btu's is of limited usefulness in determining what Congress meant in setting ceiling prices for natural gas on a Btu basis. Unlike those situations in which Congress delegates to an agency the choice of methodologies or definitions, see, e.g., 29 U.S.C. Sec. 880(b) (Supp. V 1981) (directing the Secretary of Labor "to develop reliable methods ... to produce more statistically accurate data on unemployment"), the Commission itself concedes that it was given "no independent authority under the NGPA to define 'Btu,' " Brief for Respondent FERC at 28 n. 28. Even according the Commission's rationale for the dry rule the respect traditionally due an agency's statutory interpretation, see, e.g., FEC v. Democratic Senatorial Campaign Comm., 454 U.S. 27, 39, 102 S.Ct. 38, 46, 70 L.Ed.2d 23 (1981); Batterton v. Francis, 432 U.S. 416, 425 n. 9, 97 S.Ct. 2399, 2405 n. 9, 53 L.Ed.2d 448 (1977), we find the Commission's dry rule--whether characterized as legislative or interpretative--to be fundamentally at odds with the Btu measurement technique implicit in the NGPA.
 
 
 65
 Because we find the dry rule "not in accordance with law," we need not reach the issues of whether the rule had been promulgated with sufficient notice and opportunity to comment; whether the rule had been improperly given retroactive effect; or whether the Commission failed to guarantee pipelines and distribution companies automatic pass through of any retroactive payments. The only issue remaining for disposition is the motion of the intervenors to dismiss one of the petitioners, Lone Star Gas Company, for failing to meet the jurisdictional prerequisites of section 506 of the NGPA, 15 U.S.C. Sec. 3416(a)(2) (Supp. V 1981). Section 506 requires any person seeking judicial review of a Commission order to have petitioned the Commission for rehearing within thirty days of the issuance of the order. See Ecee, Inc. v. FERC, 611 F.2d 554, 559-66 (5th Cir.1980) (applying this requirement to persons seeking judicial review of agency rulemaking). It is undisputed that Lone Star did not file for rehearing of the Commission's Order 93, in which the Commission's dry rule was first announced, but did file within thirty days of the Commission's explanatory order, Order 93-A. Although we do not require persons to read vague agency rules with the clairvoyance of "the most tireless of advocates," Sam Rayburn Dam Electric Co. v. FPC, 515 F.2d 998, 1117 n. 35 (D.C.Cir.1975), the fact that all of the other petitioners in this action found Order 93 sufficiently clear to trigger petitions for agency reconsideration convinces us that the Order was not so ambiguous as to excuse Lone Star from the NGPA's filing provision. Accordingly, we dismiss Lone Star for failing to meet the jurisdictional requirements of the Act. Because all of the arguments advanced by Lone Star before this court are also advanced by several of the other petitioners, however, our dismissal of Lone Star does not affect the issues presented in this case.
 
 
 66
 For the reasons discussed above, the Commission's measurement of Btu content established in section 270.204 of its rules of practice must be vacated.
 
 
 67
 It is so ordered.