**SHELL OFFSHORE INC., et al., Petitioners,**

v.

**FEDERAL ENERGY REGULATORY COMMISSION, Respondent.**

Nos. 88–4220, 88–4228.

United States Court of Appeals, Fifth Circuit.

Nov. 2, 1988.

---

Michael E. Coney, Shell Oil Co., New Orleans, La., Thomas G. Johnson, Charles, J. McClees, Jr., Ellen V. Gross, Craig H. Walker, Shell Oil Co., Houston, Tex., for Shell Offshore and Shell Oil Co.

Michael J. Manning, James F. Moriarty, Fulbright & Jaworski, Washington, D.C., Lowell E. Williams, Houston, Tex., for Columbia Gas Development Corp.

James F. Moriarty, Fulbright & Jaworski, Michael J. Manning, Washington, D.C., for Samedan Oil Corp.

Thomas J. Eastment, Baker & Botts, Washington, D.C., Charles L. Spann, Sun Expl. & Prod. Co., Dallas, Tex., Janice J. Cleavinger, Pogo Producing Co., Houston, Tex., for Sun Exploration & Production Co. and Pogo Producing Co.

Jerome Feit, Sol., F.E.R.C., Samuel Sooper, Frank R. Lindh, Washington, D.C., for F.E.R.C.

Kevin M. Sweeney, Grove, Jaskiewicz, Gilliam & Cobert, George C. Garikes, Carroll L. Gilliam, Washington, D.C., Robert A. Luettgen, Mobil Oil Corp., Houston, Tex., for Mobil Exploration and Producing North America Inc. and Mobil Producing Texas & New Mexico Inc.

Before GARZA, JOHNSON and HIGGINBOTHAM, Circuit Judges.

GARZA, Circuit Judge:

Petitioners, who are oil producers, seek review of Federal Energy Regulatory Commission ("Commission") orders concerning ten petitions for adjustment filed by petitioners under § 502(c) of the Natural Gas Policy Act of 1978, ("NGPA") 15 U.S.C. § 3412(c). The petitions for adjustment requested waivers of portions of payment of refunds owed by petitioners to various gas purchasers. The producers claim that the previous overpayments, made as a result of the D.C. Circuit's decision in *Interstate Natural Gas Ass'n of America v. Federal Energy Regulatory Commission*, 716 F.2d 1 (D.C.Cir.1983), *cert. denied,* 465 U.S. 1108, 104 S.Ct. 1615, 80 L.Ed.2d 144 (1984), are uncollectible under the standards set forth in *G.E.C. Oil & Gas Operations,* 33 F.E.R.C. ¶ 61,013 at 61,032–33 (1985). If deemed uncollectible by the Commission,

the refund obligation of a producer would have been waived. The Commission, however, denied petitioners' request for adjustment, and as a result they have appealed that decision here. Jurisdiction of this court lies under §§ 502(c) & 506(a)(4) of the NGPA. For the reasons below, it is our conclusion that the decision of the Federal Energy Regulatory Commission in denying petitioners' petitions for adjustment should be AFFIRMED IN PART AND REVERSED IN PART.

*I. Background.*

In 1983 the U.S. Court of Appeals for the D.C. Circuit considered the case of *Interstate Natural Gas Ass'n of America v. Federal Energy Regulatory Commission,* 716 F.2d 1 (D.C.Cir.1983), *cert. denied* 465 U.S. 1108, 104 S.Ct. 1615, 80 L.Ed.2d 144 (1984) (*"INGAA–I"*). The holding in that case prescribed the method by which the energy content of natural gas, which is measured in terms of British Thermal Units ("Btu's"), was to be measured for purposes of determining the price-per-Btu of gas under the wellhead price ceilings of Title I of the NGPA. The Commission's rule, known as the "dry" rule, provided that the Btu content of gas must be measured "as delivered." In contrast, the "wet" rule required by the court in *INGAA–I* measures the energy content of gas based on specified standard conditions.[1] The impact of the wet rule promulgated in *INGAA–I* is that gas producers were entitled to less money per unit of gas sold under the wet rule than under the dry rule.

On remand, the Commission reinstated the wet rule. FERC Order No. 356, 49 Fed.Reg. 3072 (1984) (codified at 18 CFR § 270). Application of the dry rule, which was in effect from December 1, 1978 to January 19, 1984, resulted in first sellers' obtaining more money per unit of gas than under the wet rule. Since the dry rule effectively raised the wellhead prices of natural gas above the NGPA maximum ceiling price, thus violating the NGPA, the Commission ordered that payments made

1. *See generally INGAA–I,* 716 F.2d at 4–5.

by purchasers during the period that the dry rule was in effect must be refunded by the first sellers. FERC Order No. 399, 49 Fed.Reg. 37735 (1984) (codified at 18 CFR § 154). Often, the first seller or producer is obligated to make royalty payments to the owner of the mineral estate; these payments are defined in terms of a percentage of production. The Commission's order, in addressing this situation, stated that the first seller or producer was responsible for refunding the *entire* overcharge, including those proceeds originally paid to royalty owners, both private and governmental. The first seller would then have a right to recover the amounts it overpaid to royalty owners.

The Commission then reconsidered its position in Order 399 and issued Order 399–A,[2] which stated that it had discretion to waive that portion of the Btu refund obligation of first sellers to purchasers which had already been paid to royalty owners and which was now impossible to recoup from the royalty owners. The Commission established standards for determining when such royalty payments were to be deemed "uncollectable" and, therefore, subject to waiver.[3]

II. *Uncollectability Standard Applied to Royalty Owners.*

A. Payments to the Minerals Management Service

On April 25, 1984, following *INGAA–I*, and in response to numerous requests from lessees for royalty refunds on land owned by the U.S. Government, the Minerals Management Service ("MMS") of the Department of the Interior published a notice of refund procedures in the *Federal Register.* 49 Fed.Reg. 17,824 (1984). Under the published procedures, applicants for refunds from MMS resulting from *INGAA–I* were required to submit information and documentation, including a "showing that the payment for which a refund or credit is sought was made within two (2) years of the request." The two-year requirement was based on § 10(a) of the Outer Continental Shelf Land Act ("OCSLA"), 43 U.S.C. § 1339(a), which provides that:

> [W]hen it appears to the satisfaction of the Secretary that any person has made a payment to the United States in connection with any lease under this subchapter in excess of the amount he was lawfully required to pay, such excess shall be repaid without interest to such person or his legal representative, if a request for repayment of such excess is filed with the Secretary within two years after the making of the repayment ...

Subsequently, on August 8, 1984, the MMS revised its original refund procedures, stating that its November 9, 1983 letter to all payors tolled the OCSLA two year time period. 49 Fed.Reg. 31,779 (1984). Thus, any producers who had made royalty payments based on the since invalidated dry rule were entitled to refunds of royalty overpayments to MMS made subsequent to November 9, 1981, absent notice to MMS which would have earlier interrupted the two-year period.

---

**2.** 49 Fed.Reg. 46353 (1984) (codified at 18 CFR § 154).

**3.** The Commission stated that:
[R]efunds owed by royalty inerest owners will not be deemed uncollectible if there is an ongoing contractual relationship between the parties which would enable an operator or first seller to recover the amounts owed through billing adjustments. Absent an ongoing contractual relationship permitting billing adjustments, refunds owed by a defaulting royalty owner will be considered uncollectible under the following circumstances: (1) the royalty interest owner is deceased and his estate is closed, (2) the royalty owner is bankrupt and the bankruptcy proceeding is closed, (3) the royalty owners cannot be located (proof that reasonable steps were undertaken to locate the owners must be submitted), or (4) statutes of limitation[s] prohibit operators from taking legal action against royalty owners to obtain the refunds.
If any one of these standards is met, the Commission will consider the refund uncollectible and will waive the obligation. In cases where none of the standards are met, the Commission will grant a waiver of the refund obligation only where the applicant demonstrates that paying the refund will jeopardize its financial condition and thus constitute a special hardship within the meaning of section 502(c) of the NGPA.
*Witt Oil Prod., Inc.,* 33 FERC ¶ 61,018, 61,042 (Oct. 15, 1985).

**1151**

In a published opinion issued December 15, 1981, the Solicitor of the Department of Interior specifically discussed the steps a lessee should take to protect its interests under § 10(a) of the OCSLA in the event of a retroactive change in the regulated price of oil or gas. The Solicitor wrote:

Suppose, for example, that a lessee has paid royalty on gas based on an unregulated price. Another petitions the Federal Energy Regulatory Commission challenging this price, and the Commission agrees, ordering the lessee to charge a lower, regulated price and to reimburse its purchasers. The two-year limit still applies from the date of payment; *but the lessee can interrupt the period by notifying the Department in writing of the challenge and of the approximate difference in the price should the challenge succeed.* Here the statute is tolled when the Department receives the notice, and it resumes when the final agency or judicial decision is issued.

Opinion, Decisions of the Department of the Interior, 88 I.D. 1090, 1102 (Dec. 15, 1981) (emphasis added).

On November 30, 1984, the MMS published what is termed Final Order on Royalty Refund Requests Resulting from FERC Orders 93 and 93–A. 49 Fed.Reg. 47,120 (1984). In its order, MMS concluded that it was statutorily barred from making refunds of royalty payments for the period December 1, 1978 to November 9, 1981, and denied requests for refunds of royalty payments made before November 9, 1981. The MMS stated that its order did not apply to any lessee who filed a proper notice with the MMS which tolled the two-year statute. Citing the solicitor's opinion, the MMS further stated that in order to have tolled the statute a payor must have given written notice of the challenge to the orders and the approximate difference if the challenge were successful.

On March 17, 1987, the Interior Board of Land Appeals ("IBLA"), acting pursuant to authority delegated to it by the Secretary of the Interior, issued a decision affirming in part the MMS's order refusing refunds, although holding that the MMS letter of November 9, 1983 constituted an acknowledgment of notice that all producers would seek refunds as a result of the *INGAA–I* decision, and stating that refunds could be obtained for payments made on or after November 9, 1981. The decision also stated that producers who believe that they filed a notice prior to November 9, 1983 should submit documentation to the MMS establishing that fact and should file an application showing their entitlement to a refund.

On May 28, 1987, the Director of the Office of Pipeline and Producer Regulation, under a delegation of authority from the Commission, denied various petitions for adjustment attributable to royalty payments to the federal government. Among those petitions denied were those of the following petitioners in this case: Pogo Producing Company, Mobil Exploration and Producing North America Inc., Mobil Producing Texas and New Mexico Inc., Shell Offshore Inc. and Shell Oil Company, Columbia Gas Development Corp., and Sun Exploration and Production Company. *Pogo Producing Co., et al.,* 39 FERC § 62,233.

Petitioners first argue that § 10(a) is a statute of limitations, and therefore the waiver criteria established by the MMS, which grants waivers for amounts which are barred by a statute of limitations, must apply. The Commission, on the other hand, claims that § 10(a) should not be construed as a statute of limitations. We hold today that § 10(a) is a statute of limitations for the purpose of determining whether the payments made by the producers to MMS fall within the definition of uncollectability.[4]

**4.** Presently pending before the United States Court of Claims is the issue of whether the two-year period begins to run at the time of payment to MMS or at the time it was adjudicated in *INGAA–I* that overpayments were made. Though we hold that § 10(a) is a statute of limitations, we do not decide or express any opinion on the question of at what point § 10(a) begins to run.

■ Our holding that § 10(a) is a statute of limitations does not mean, however, that the producers are automatically entitled to a waiver for the entire amount of royalty overpayments to MMS. Rather, we hold that the producers must still show, under the uncollectability criteria, that they took every reasonable opportunity to protect their rights. The producers could have tolled the two-year statute of limitations by giving notice to the MMS of the fact that the royalty payments may have been too great, and that they may seek a refund depending on the outcome of the *INGAA–I* litigation. The producers can not idly sit by while the statute of limitations runs and then be heard to request a waiver of their refund obligations when they could have taken the simple step of filing notice with the MMS in order to toll the statute of limitations and protect their right to a royalty refund.

Our holding that § 10(a) is a statute of limitations does not lead inexorably to the conclusion that an automatic waiver of all royalty overpayments from December 1, 1978 to November 9, 1981 is appropriate. We note the government's analogy to one of the other waiver criteria; specifically, that a royalty payment will also be deemed uncollectible if the royalty owner is bankrupt. A producer should not be allowed to passively sit by while a royalty owner with a refund obligation goes through bankruptcy proceedings, then, after bankruptcy is closed, seek a waiver of the amount now supposedly uncollectible due to bankruptcy. Rather, the producer would be expected to actively prosecute its claim throughout bankruptcy proceedings before seeking a waiver for any shortfall. By analogy, the government correctly points out that under § 10(a) the producers are still required to protect their interests by filing notice as soon as the need to do so was reasonably apparent.

Petitioners certainly should have known that the dry rule, which was highly controversial from its inception, had a high probability of being reversed, thus mandating repayments of overcharges. In fact, some producers, such as Shell, Mobil, and Sun, participated as parties in the *INGAA* litigation before the Commission and the D.C. Circuit, and therefore knew firsthand the intensity of controversy surrounding the dry rule. The Director of the Commission held:

> [T]he Commission's order promulgating the dry rule was strongly contested from the day it was first explicitly announced. First sellers who relied on that interpretation knew (or should have known) that their entitlement to the financial benefits from the application of the dry rule would be contingent upon a favorable adjudication by the courts. Many first sellers participated extensively in the litigation that ultimately resulted in the dry rule being struck down.

39 FERC ¶ 62,233, 63,542 (May 28, 1987) (quoting FERC Statutes & Regulations, Order No. 399–A, Preambles 1982–1985 at ¶ 31,206).

Shell and Columbia were even advised in writing by their pipeline customers in October and November 1981 that the dry rule was subject to challenge and possible refunds. Clearly, petitioners in this case knew of the high possibility that the dry rule would be reversed, and that they would have to make refunds.

The petitioners were also clearly aware of the requirement to file a request for repayment of royalty payments to MMS within two-years of the date of payment under the plain terms of § 10(a) of OCSLA. On top of that, the Solicitor of the Department of the Interior issued an opinion in 1981 addressing the very type of situation faced by petitioners: that is, how producers could protect their interests by filing notice with MMS.

In the face of the high possibility of the dry rule being reversed, the corresponding risk of being required to make refunds, and the clear requirement that notice of a possible refund be served on MMS, the petitioners responded with inaction. Petitioners could have easily sent notice to MMS of the possibility that, contingent upon the resolution of *INGAA–I*, they might seek refunds of royalty overpayments. This would have

protected their rights. The Commission Director held that:

> Any current inability to these petitioners to obtain repayment is due to their own failure to take foreseeable and necessary procedural steps in order to protect their ability under section 10 of the OCSLA to obtain refunds from MMS. Accordingly, there is no basis upon which to make a finding of uncollectibility.

39 FERC at n. 55. The petitioners, who knew or should have known of a potential refund obligation, and failed or chose not to take the simple step of filing a request to obtain potential repayment, must accept the adverse consequences of that decision.

Petitioners also assert that, even if they are held to have known of the high possibility of a refund obligation arising, they should be absolved of the requirement to file notice because they were confused about the proper construction to be given § 10(a) of OCSLA and the procedure for filing a contingent refund request. This court greets such assertions, made by highly sophisticated industry participants, with skepticism. But, even if these assertions are believed, the reasonable and prudent course in the face of such confusion would be for petitioners to protect their rights by filing notice, even if uncertain whether the notice is necessary.

 However, the need to file notice may not have been reasonably apparent prior to the Solicitor of the Department of the Interior's opinion on December 1, 1981. This is true even though petitioners were aware of the provisions of § 10(a), knew of the controversy surrounding the dry rule, and were even informed of the possibility of overcharges by their customer. But since hindsight is occasionally better than 20-20, we today hold that the need to file notice with MMS of possible royalty overpayments did not become reasonably apparent until the Solicitor issued his opinion on December 15, 1981. This means that the petitioners are responsible for and cannot obtain refunds from MMS for any payments after December 15, 1979. However, since we have held that § 10(a) is a statute of limitations, the petitioners have met the uncol-

lectability requirements of the Commission, and the refund obligation for overcharges equal to the amount of royalty overpayments to MMS from December 1, 1978 to December 15, 1979 should be waived.

### B. Payments to Louisiana and Texas

 On November 26, 1984, the Louisiana Department of Natural Resources issued notices stating that until a decision was reached by the Louisiana Department of Natural Resources Office of Mineral Resources, State Mineral Board ("State Mineral Board"), lessees are not authorized to withhold payment from monthly royalties to recoup Btu refunds. On October 9, 1985, the State Mineral Board adopted the following resolution:

> WHEREAS, F.E.R.C. Orders 399, 399-A and 399-B issued September 20, 1984, November 26, 1984 and July 18, 1985 provide that producers are not required to refund the royalty portion of any overcharges to purchasers prior to November 1986, in as much as the F.E.R.C. has no authority to order repayment by royalty owners, and
>
> WHEREAS, on August 26, 1985 the Federal Energy Regulatory Commission denied requests for stay and rehearing of F.E.R.C. Order 399-B,
>
> THEREFORE BE IT RESOLVED, that the State Mineral Board, consistent with its previous position on F.E.R.C. 399, 399-A and 399-B, and in conformity with the state lease terms will not authorize its lessees/payors to withhold or recoup from future royalties, the royalty portion of any overcharges arising from gas production affecting state leases, and
>
> BE IT FURTHER RESOLVED, that appropriate legal action, including interest and penalties will be taken against lessees/payors who take unauthorized recoupments ... overcharges, as to the royalties portion.

Petitioners Mobil Exploration and Producing North America, Inc., Mobil Oil Exploration and Producing Southeast, Inc., Mr. Edwin L. Cox, Phillips Petroleum Company, Conoco, Inc., and Samedan Oil Corp. were refused adjustment related to royalty

payments to Louisiana and argue that the resolution passed by the State Mineral Board renders the amounts overpaid "uncollectable" under the *GEC Oil* standard. Samedan Oil Corp. was also refused adjustment of refunds attributable to royalty payments to Texas.

The Director correctly held that petitioners had failed to show that the overpayments were uncollectible. The resolution adopted by the Louisiana State Mineral Board is not an unconditional refusal to pay, but rather is a refusal to authorize recoupment of overpayments by withholding from future royalty payments. Moreover, no such resolution was passed by Texas, and petitioners merely state that they requested a refund from Texas, which was refused. Petitioners do admit that they could file suit to recoup the payments. Unwillingness to bear the costs of litigation or to risk harming one's business relationship with another does not excuse petitioner's refusal to take further action to enforce their rights. Neither Texas nor Louisiana have the legal right to cancel leases in retaliation if a suit is filed against them to recover past royalty overpayments. Therefore, we uphold the Commission's holding that petitioners have not met the uncollectability standard with respect to payments to Texas and Louisiana.

### III. *Conclusion.*

Since petitioners failed to give notice to MMS of the possibility of an overpayment, the holding of the Commission that petitioners have not met the uncollectability standard with regard to royalty overpayments made between December 15, 1979 and November 9, 1981 to MMS is AFFIRMED. However, since the need to give notice to MMS did not become reasonably apparent until December 15, 1981, petitioners have met the uncollectability standard with regard to payments made from December 1, 1978 to December 15, 1979; therefore, the refund obligations are waived and to the extent that the Commission's holding is in conflict with this result it is REVERSED.

Since petitioners also failed to show an unconditional refusal to pay on the part of Louisiana and Texas, and have shown no reason supporting their refusal to litigate, the Commission's holding that petitioners have not met the uncollectability standard with respect to royalty overpayments to Louisiana and Texas is also AFFIRMED.

As a final matter, the stay which was granted by this court, on April 22, 1988, against the order of the Federal Energy Regulatory Commission in order to allow the producers to withold certain refund payments to their customers pending the outcome of this litigation is no longer necessary and is hereby lifted. If necessary, the amount of refunds under this opinion will be determined by the Federal Energy Regulatory Commission.